GUSTAVE and ELSA LaSTAITI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
La Staiti v. Commissioner
Docket No. 6067-77.
United States Tax Court
T.C. Memo 1980-547; 1980 Tax Ct. Memo LEXIS 44; 41 T.C.M. (CCH) 511; T.C.M. (RIA) 80547; December 8, 1980
Edward F. Hines, Jr.,Samuel B. Bruskin, and MitchellH. Kaplan, for the petitioners. W. Terrence Mooney, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency of $ 2,685.84 in petitioners' 1973 income tax. This deficiency was the result of the Commisioner's determination that a $ 16,735 business bad debt deduction claimed by petitioners in respect of purported loans *45 and loan guarantees for the benefit of LaStaiti Associates, Inc., and other corporations organized by the petitioner-husband, was allowable only as a nonbusiness bad debt, and was accordingly subject to the limitations applicable to short term capital losses. In their petition, the petitioners increased the stakes in this case by claiming that they were entitled to total business bad debt deductions of $ 107,698, rather than the lesser amount claimed on their return. By an amended answer filed after the trial, the Government claimed a $ 1,541.84 additional deficiency on the grounds that petitioners' purported loans and loan guarantees were nondeductible capital contributions, rather than loans, or were debts which did not in fact become worthless in 1973. Thus, with respect to each of the purported loans and loan guarantees in issue, the following questions are presented for decision: (1) Did the purported loan or loan guarantee give rise to a bona fide debt, or was it a nondeductible capital contribution; (2) Did the debt become worthless in 1973; and (3) Was the debt a fully deductible business bad debt, or was it a nonbusiness bad debt subject to the limitations on deductions *46 of short term capital losses. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners, husband and wife, are cash basis taxpayers. They resided in New Bedford, Mass. at the time their petition was filed. Since the bad debt deductions in issue arose from claimed advances or loan guarantees for a business controlled by the petitioner-husband, he will sometimes be referred to as "petitioner". Petitioner Gustave LaStaiti was born in 1910 and immigrated to the United States at the age of 10. After leaving school, he began work as a hairdresser. He subsequently was employed by an operator of beauty shop concessions in department stores and traveled throughout the country opening beauty salons. While he was thus employed, around 1932-1933, his employer offered to sell him a beauty shop concession and to permit him to pay for it over time. Petitioner accepted this offer, and began operating the beauty shop concession in the Cherry & Webb Department Store in New Bedford, Mass. as a sole proprietor.From there, petitioner extended his operations to the other Cherry & Webb stores. *47 In time, other department store chains asked petitioner to open beauty salons in their stores, and petitioner gradually opened more salons at the rate of approximately one to two stores per year. He also established a number of hairdressing schools, to provide his shops with trained employees, and two beauty supply houses, to assure his shops of a supply of beauty products. Petitioner organized a number of corporations to operate various segments of the beauty enterprise. Some of these corporations also had separate operating divisions and subsidiaries. These corporations and their operating divisions and subsidiaries were all components of the beauty business controlled by petitioner, and references to the beauty business or enterprise include such corporations and their component parts. In 1955, petitioner organized a Massachusetts corporation to own and operate his beauty salons. He contributed the assets of the business to the corporation solely in exchange for all of its stock. After 1966, the corporation was known as LaStaiti Associates, Inc. (hereinafter sometimes referred to as "Associates"). In 1959, petitioner organized La Baron Hairdressing Academy, Inc. (La *48 Baron), a Massachusetts corporation, to own and operate a number of hairdressing schools. Petitioner owned 66-2/3 per cent of La Baron as of December 31, 1968. In the early 1970's, all of La Baron's stock was transferred to Associates, and La Baron thereafter operated as a wholly-owned subsidiary of Associates. Ron San Realty Corp. (Ron San), was incorporated in 1963 to own certain real estate which it leased to Associates; petitioner owned all of its stock until June of 1972. V.V.N., Inc. (V.V.N.), a Massachusetts corporation, was organized in 1965 by petitioner and his brother, who each initially owned 50 percent of its stock. V.V.N. owned and operated three beauty salons. In early 1972, petitioner purchased his brother's stock, and thereafter remained the sole stockholder of V.V.N. until June of 1972. The beauty supply houses were not separately incorporated; they did business as Dartmouth Discount Beauty Supply Co. (Dartmouth Discount), and were operated as a division of LaStaiti Associates. By the end of 1968, petitioner's beauty salon oprations had expanded from a single shop to some 45 locations, and were associated with six department store chains. Most of the salons *49 were operated on leased premises in department stores. The salons, hairdressing schools, and beauty supply houses were located in upstate New York and throughout Massachusetts and northern New England, except Vermont. In 1968, which appears to have been the beauty enterprise's most successful year, it had approximately 650-700 employees and annual gross sales in excess of $ 2.5 million. Around 1969, the beauty enterprise began encountering financial difficulties, and it incurred substantial operating losses in that year, although it earned a modest profit in 1970. The concern's financial problems were primarily the result of working capital shortages caused by the rapid expansion of the business and a lack of adequate management. The beauty concern's working capital shortages were primarily the result of expansion of the beauty salons at a rate beyond the financial capacity of the beauty enterprise. Although the beauty enterprise as a whole had been growing from the time petitioner opened his first salon, competitive pressures required Associates to expand its beauty salon operations at a greatly increased rate in the late sixties and early seventies, straining the financial *50 resources of the enterprise as a whole and requiring additional financing. At that time, the beauty salons were associated with five to six department store chains, and as these chains opened new stores in newly constructed suburban shopping malls, LaStaiti Associates was forced to open new salons in these stores or face increased competition and the possible loss of its relationships with the department store chains. In order to satisfy the demands of the department store chains, Associates found it necessary to open as many as four to six new beauty salons each year, as opposed to the one or two salons it might have preferred to open. This expansion, which occurred at a pace greatly in excess of any expansion the beauty enterprise had previously experienced, strained Associates' finances. Petitioner had always found it necessary to borrow funds to cover the costs of expansions of the beauty enterprise, although the enterprise had always been able to repay these loans. The newly opened salons also generally incurred initial operating losses, which also had to be financed. Thus, beginning in 1969, the beauty enterprise faced serious working capital difficulties. These difficulties *51 were exacerbated in 1970 by the effects of a recession, although Associates earned a modest profit in that year. The beauty enterprise also began having management difficulties in 1969. Until 1969, petitioner traveled approximately 60,000 miles per year personally supervising the operations of the beauty business. Since the oeration of beauty salons required personal services, petitioner considered supervision of the beauty salons to be very important, and he personally assisted in the selection of employees and methods of operation for each salon, visiting each salon approximately once every two weeks. However, because of his participation in a new business venture, hereinafter described, petitioner could no longer devote his full time to the mangement of the beauty enterprise. In 1968, a group of business and professional people in New Bedford, led by petitioner, began an effort to secure a charter for a new commercial bank. The charter was issued in 1969, and the new bank, Southeastern Bank & Trust Co. (Southeastern), opened for business in New Bedford in June, 1969.Petitioner served as president and chief operating officer of Southeastern, and was also among its largest *52 shareholders with holdings of six to ten percent of the corporation's outstanding shares. His principal function with Southeastern was the development of business for the bank. Petitioner began working full time for Southeastern after its charter was acquired early in 1969, sometimes working 60 hours per week, and started receiving a salary from Southeastern at some time early in 1970. Petitioner attempted to continue to manage the beauty business after he began work at Southeastern. However, he was able to devote only nights and weekends to the beauty business, and he was unable to continue to travel to supervise its operations outside of New Bedford. The beauty business was not well managed in his absence. He hoped to continue running the business part time until his son Ronald graduated from Harvard Business School in the summer of 1970. However, although Ronald became president of La Staiti Associates after his graduation, he resigned near the end of that year, partly because his father still continued to exert control over the operations of the company. Thereafter, Ronald became a loan officer at Southeastern. After his son left LaStaiti Associates near the end of *53 1970, petitioner began searching for a buyer for the business. He did not consider leaving his job at the bank and returning to the beauty business because he believed his job at the bank presented more of a challenge and was financially more attractive. Also, petitioner felt a responsibility to the investors in the bank who had supported its organization. Petitioner feared that management and working capital problems might cause the beauty business to fail unless it was sold. Petitioner was concerned about the failure of the beauty business and desirous of its sale and continuance as a going concern for two reasons. First, he was concerned that the failure of the beauty enterprise might jeopardize his position with Southeastern. Petitioner's primary responsibility at Southeastern was to develop business for the bank. Since the failure of the beauty business would likely have damaged petitioner's reputation as a successful businessman, and this reputation contributed to his ability to obatin business for the bank, petitioner was concerned that he might lose his job with the bank if the beauty business failed. The loss of petitioner's position with the bank would have dealt *54 him a serious financial blow. Although petitioner was a successful entrepreneur for many years, substantially all of his income consisted of salaries, rather than income from investments. As of the middle of 1970, and through at least the end of 1973, substantially all of petitioner's income was obtained from his salary from Southeastern. Petitioner received salary income of $ 27,902 from Southeastern in 1970, and thereafter received $ 40,810 in 1971, and $ 40,040 in both 1972 and 1973. In later years, his annual salary increased to $ 60,000. Likewise, when petitioner was receiving salaries from the beauty corporations, these salaries [1] represented substantially all of his income. Although petitioner owned a controlling interest in the beauty corporations, they never paid any dividends. Petitioner also borrowed $ 160,000 to buy stock in Southeastern in 1969, but his investment did not yield any dividends until 1975 or 1976. Thus, although petitioner had some investments, he obtained substantially all of his income from salaries, and the loss of his salary income would have caused him personal financial difficulties. *55 Petitioner's second concern with respect to the possible failure of the beauty enterprise, and another factor prompting his decision to sell the enterprise, was his large potential liability on the obligations of the enterprise. It was frequently necessary to borrow money for the operations of the beauty enterprise, and after the enterprise was incorporated, petitioner's personal guarantee was invariably required in order to obtain the necessary loans. Mrs. LaStaiti's personal guarantee was frequently required as well. As of the end of 1970, petitioner's personal liability with respect to loans for the beauty enterprise exceeded $ 500,000. Moreover, as of this time, the beauty enterprise was a party to approximately 60 leases, each of which petitioner had personally guaranteed. These leases had an average remaining life of three years, and the aggregate annual rental due under the leases was approximately $ 300,000. Although the book value of the assets of Associates and the other beauty corporations [2] was in excess of liabilities, as illustrated in greater detail by the summary of Associates' balance sheet shown below, [3] the sale of these assets would not have produced *56 sufficient sums to discharge all of the enterprise's obligations as to which petitioner was personally liable. As of December 31, 1970, Associates' largest category of assets was furniture and fixtures with a book value of approximately $ 290,000; although these assets had value as long as the beauty enterprise continued as a going concern, the difficulty of removal of these assets would have made them of little value if sold in a liquidation sale. Similarly, the merchandise inventory of approximately $ 215,000 could not have been liquidated at full value, since much of the inventory consisted of used products. Petitioner accordingly sought to sell the business as a going concern so that his liability on the obligations of the beauty enterprise would be discharged. He hoped that the department store demands for expansion of the beauty salons would moderate, and that a purchaser of the enterprise would contribute additional capital and keep the beauty enterprise operating in its expanded form until it became profitable. *57 Petitioner did not immediately find a buyer for the beauty enterprise; most potential buyers with the necessary expertise in the hairdressing field did not have the necessary resources and financial acumen to arrange for the purchase of the enterprise.However, at some time in 1971, petitioner and Allvend Industries, Inc. (Allvend), a corporation engaged in the operation of a group of unrelated businesses, began negotiations for the sale of the beauty enterprise to Allvend. These negotiations eventually were successful, and on February 23, 1972, petitioner entered into an agreement to transfer all of his stock in Associates, Ron San, and V.V.N. to Males Only, Inc., a wholly-owned subsidiary of Allvend which operated barber shops, solely in exchange for Allvend common stock. Males Only began operating the beauty enterprise in February of 1972. However, the agreement between petitioner and Allvend was modified on June 5, 1972, and petitioner did not receive his Allvend stock until after this modification, which will be described hereinafter. In preparation for the exchange of stock between petitioner and Allvend, audited consolidated financial statements were prepared for Associates, *58 Ron San, and V.V.N. as of December 31, 1971. These statements indicated that Associates alone had a net loss of $ 66,824.53 for the year ended December 31, 1971, and that the consolidated net loss of the beauty enterprise as a whole for the period ended December 31, 1971, was $ 89,105.99. As of December 31, 1971, the consolidated balance sheet of the beauty enterprise, which is summarized in detail below, [4] showed total capital stock of $ 92,459.52 and additional paid-in capital of $ 174,831.13. [5] There was a retained earnings deficit of $ 156,425.04. The beauty enterprise had outstanding notes payable to banks in the aggregate amount of $ 507,712.67, $ 211,275.05 of which was payable in one year, and also had $ 103,273.75 of outstanding notes payable to other creditors. *59 Pursuant to the modified agreement between petitioner and Allvend, petitioner received 15,000 shares of Allvend common stock in June of 1972. This stock was not listed on any national securities exchange, although there were 690,300 shares of such stock outstanding, and such shares were traded on the over-the-counter market at approximately $ 9 per share. The modified agreement with Allvend states that "an essential prerequisite" of the modification of the plan of acquisition was the provision of $ 175,000 of "immediate financing" for Associates; petitioner agreed to arrange for this financing through a new mortgage loan secured by real property owned by the beauty enterprise. In addition to the above financing, the modified agreement further provided that "the continued operations of Associates will require substantial additional working capital"; if petitioner obtained financing of between $ 100,000 and $ 500,000, he was to receive up to 25,000 additional shares of Allvend stock. The record does not disclose whether petitioner ever received any such additional stock. After the sale of the beauty enterprise, petitioner was not actively associated with the beauty enterprise, *60 but he often gave advice to Allvend upon request and assisted Allvend in raising capital. Although petitioner was a director of Associates, Ron San, V.V.N., and La Baron until some time in 1973, he did not attend directors meetings after the disposition of the beauty enterprise. Despite petitioner's disposition of the beauty enterprise, it failed to prosper. On October 25, 1973, Allvend, Males Only, Associates, V.V.N., and Ron San filed petitions under Chapter XI of the Bankruptcy Act in the United States District Court for the Southern District of New York. Associates was adjudicated a bankrupt on April 2, 1976, and Ron San was adjudicated a bankrupt on June 2, 1977. As has been previously noted, it was often necessary for petitioner to borrow funds for the operations of the beauty enterprise, and he obtained a number of loans for this purpose in the years 1969 through 1973. On October 29, 1969, petitioners borrowed $ 75,000 from the National Shawmut Bank of Boston (Shawmut) and immediately transferred the proceeds to Associates for its use as working capital. The loan was recorded on Associates' books as a loan received from the Shawmut Bank, and Associates made payments *61 on the loan directly to Shawmut. On December 28, 1970, LaStaiti Associates borrowed $ 50,000 from the Merchants National Bank of New Bedford (Merchants National). Petitioner personally guaranteed thhis loan, and Associates used the proceeds for working capital. In 1971, additional loans were required to provide the beauty enterprise with the working capital necessary to keep it afloat. On April 28, 1971, petitioners borrowed $ 42,000 from Slade's Ferry Trust Company (Slade's Ferry), located in Somerset, Mass., and borrowed an additional $ 28,000 from that institution on May 19, 1971. The proceeds of these two loans were transferred by petitioners to Associates; Associates treated these two loans on its books as loans received directly from Slade's Ferry and made loan payments directly to Slade's Ferry. On May 3, 1971, B.M.C. Durfee Trust Company (Durfee Trust) of Fall River, Mass., loaned $ 75,000 to Dartmouth Discount, a division of LaStaiti Associates, Inc. The proceeds of the loan were deposited to the account of Associates. The note evidencing the loan was co-signed by M. Murdock MacDonald, manager of Dartmouth Discount, and his wife Sandra MacDonald, petitioners' daughter.
*62 As a part of the June 5, 1972, modified agreement concerning the transfer of his stock to Males Only, petitioner agreed to assist in obtaining a new mortgage loan to be secured by the real estate owned by Ron San. Pursuant to this agreement, Mr. LaStaiti arranged for a $ 105,300 loan from Domestic Credit Corporation (Domestic Credit) of Cranston, Rhode Island, to Ron San. This loan, which was made on July 10, 1972, was secured by a second mortgage on certain real estate owned by Ron San, and was guaranteed by petitioner, Associates, Allvend, Eddie Hutcher, Edward Weiss, Meyer Weiss, and Donald Kranis. The latter four men were members of Allvend's board of directors. The proceeds of the loan were used for working capital. On January 25, 1973, Associates borrowed $ 70,000 from Franklin National Bank (Franklin National) in New York. This loan was guaranteed by petitioner, Edward Weiss, and Allvend. Associates used $ 69,000 of the proceeds of this loan to pay off the Slade's Ferry loans. In 1973, petitioner made payments in the aggregate amount of $ 107,697.95 on account of the foregoing loans, as shown by the following schedule, which also summarizes the pertinent facts with *63 respect to the loans: Petitioner's
Date(s)
Date of
Principal
Primary
1973
of 1973
Creditor
loan
Amount
Obligors
payment(s)
payments(s)
Shawmut
10/29/69
$ 75,000
Petitioners
$ 41,237.73
09/10/73
32.50
09/22/73
$ 41,270.23
Merchants Nat'l
12/28/70
50,000
Associates
$ 3,171.96
12/19/73
Slades Ferry
04/28/71
42,000
Petitioners
None
05/19/71
28,000
Durfee Trust
05/03/71
75,000
M.MacDonald
$ 20,000.00
11/19/73
S.MacDonald
Dartmouth Discount
10,000.00
12/11/73
$ 30,000.00
Domestic Credit
07/10/72
105,300
Ron San
$ 4,174.65
11/19/73
1,391.55
12/17/73
$ 5,566.20
Franklin Nat'l
01/25/73
70,000
Associates
$ 7,689.56
07/03/73
20,000.00
11/19/73
$ 27,689.56
$ 107,697.95
After the filing of Associates' Chapter XI petition, petitioner did not consider it likely that he would recover anything on account of his payments of Associates' obligations; it was petitioner's opinion that most of Associates' assets were permanent fixtures which would not produce any net funds in a liquidation sale that would be available *64 to general creditors. A summary of Associates' debts and assets as of the date of the Chapter XI petition was filed with the bankruptcy court on January 21, 1974. The summary showed priority debts (Federal and state taxes) of $ 218,632.96 and unsecured claims of $ 706,649.62, or total indebtedness of $ 925,282.58. The total assets shown by the summary were itemized as follows: Stock in trade
$ 125,000.00
Machinery, fixtures, and tools
276,473.00
Debts due on open account
206,654.29
Telephone deposit
1,600.00
$609,727.29
Of the debts due on open account, $ 166,654.29 was due from five other subsidiaries of Allvend, all of which had also filed Chapter XI petitions on October 25, 1973. The stock in trade could not have been liquidated for its full value, and the machinery, fixtures and tools were used equipment which would probably have sold for an insubstantial sum in a forced sale. In 1975, petitioner filed a claim against LaStaiti Associates in the Chapter XI proceedings. The amount of this claim, as originally filed, was $ 354,337.72; this claim was later reduced by stipulation to $ 302,000, and as so reduced, was deemed provable and allowable as *65 a general unsecured claim. Petitioner has recovered nothing on this claim, and his claim against Associates appears to have no value. On January 26, 1979, the Trustee in bankruptcy of LaStaiti Associates filed an interim report with the bankruptcy court concerning assets on hand as of January 22, 1979. No claims had been paid as of that date, and assets on hand, which were valued at $ 179,776.88, were substantially less than a $ 443,597.47 priority claim filed by the Internal Revenue Service. Petitioner has never recovered anything from Allvend Industries in its bankruptcy proceeding, although Allvend has not been adjudicated a bankrupt and was still operating under Chapter XI at the time of the trial. Petitioner also has not recovered anything from any other guarantors of loans with respect to which petitioner made payments in 1973. Immedidately after the Chapter XI petitions were filed, petitioner engaged a bankruptcy attorney to pursue his claims against Associates, Allvend, and the Allvend principals who had been guarantors on the Domestic Credit and Franklin National loans. Petitioner's bankruptcy attorney retained an investigator to determine the prospects of recovery *66 from the individuals who had guaranteed the Franklin National and Demestic Credit loans. However, the investigation indicated that the individuals had no assets and that efforts to recover from them would be fruitless. Petitioner pursued no collection activities against Murdock MacDonald and Sandra MacDonald, his son-in-law and daughter, with respect to their liability as obligors on the loan from Durfee Trust. On their 1973 Federal income tax return, petitioners claimed a business bad debt deduction of $ 16,735 for payments made in that year on account of petitioner's status as a guarantor of obligations of LaStaiti Associates and related companies. In the notice of deficiency, the Commissioner allowed the deduction only as a nonbusiness bad debt, and hence as a short-term capital loss, on the ground that the guarantee obligations were not incurred in the course of petitioner's trade or business. In their petition, petitioners claimed an additional deduction of $ 90,963 on account of their payments in 1973 purportedly as obligors and guarantors of certain allegedly business related loans. In its answer, the Government denied that it had erred in failing to allow petitioners *67 any deductions in excess of those allowed in the notice of deficiency. By an amended answer filed May 22, 1980, after the trial of this case, the Government claimed an additional deficiency of $ 1,541.84 on the grounds that all of petitioner's payments in 1973 were nondeductible because they were capital contributions or debt which did not become worthless in 1973. OPINION Section 166(a) permits the deduction of debts which become wholly worthless within the taxable year. Deductions are allowable only with respect to bona fide debts, debts arising "from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money"; a gift or a contribution to capital cannot be considered a debt. Sec. 1.166-1(c), Income Tax Regs. Furthermore, with respect to noncorporate taxpayers, the debt must be "created or acquired * * * in connection with" the taxpayer's trade or business; if the debt is not so created or acquired, it is a "nonbusiness debt", and the loss on the worthlessness of the debt is deductible only as a short-term capital loss. Section 166(d), I.R.C. 1954. Losses incurred with respect to guarantees of loans may also *68 be deductible as bad debts. If a taxpayer sustains a loss as a result of being required to discharge his obligation as a guarantor of a corporate obligation, the loss is generally deductible as a nonbusiness bad debt. However, if the loss incurred as a result of the worthlessness of the corporation's obligation to repay the guarantor was incurred in connection with the guarantor's trade or business, payments in satisfaction of the guarantee are fully deductible business bad debts. See section 1.166-8(b), Income Tax Regs.; Putnam v. Commissioner, 352 U.S. 82, 85, 88 (1956). No deduction is allowed the guarantor of a corpoirate obligation if, considering the circumstances as of the time of the creation of the guarantee obligation, the payment in satisfaction of the guarantee is in fact a shareholder contribution of capital to the corporation. Section 1.166-9(c), Income Tax Regs.; Casco Bank & Trust Co. v. United States, 544 F. 2d 528, 534-535 (1st Cir. 1976), cert. denied 430 U.S. 907 (1977); Santa Anita Consol.,Inc. v. Commissioner, 50 T.C. 536, 550 (1968); see French v. United States, 487 F. 2d 1246, 1248-1249 (1st Cir. 1973). *69 Petitioners contend that their 1969 advance to Associates, as well as Mr. LaStaiti's payments pursuant to his guarantees of debts of the beauty enterprise, gave rise to bona fide debts that became worthless during 1973, thus entitling petitioners to bad debt deductions in that year. They further argue that they are entitled to deduct their losses as business bad debts, claiming that these debts were proximately related to Mr. LaStaiti's trade or business of being an employee of the beauty corporations or Southeastern. The Government argues that the beauty enterprise was initially undercapitalized and was in rapidly declining financial condition from the time of the first advance in issue until the filing of its bankruptcy petitions. The Government thus concludes that the petitioner could not have had a reasonable expectation of repayment with respect to the advance and guarantees, and that the advance and the payments pursuant to the guarantees were contributions to capital, not bona fide debts. In the alternative, the Government maintains that even if we find that the advance and guarantees resulted in bad debts, the petitioners have not established that the debts became worthless *70 in 1973. [6] The Government further argues that any worthless debts were incurred to protect petitioner's investment in the beauty enterprise, and are accordingly deductible only as nonbusiness bad debts because they were not related to petitioner's trade or business. *71 Petitioners made total payments of $ 107,697.95 in 1973 with respect to one advance and four loan guarantees for the benefit of the beauty enterprise, as set forth supra at 21. The advance and loan guarantees occurred over a period of approximately four years. The tax treatment of petitioners' losses with respect to the advance and loan guarantees varies in accordance with the differing circumstances surrounding each transaction. The discussion which follows is thus organized in accordance with what we find to be the factual circumstances surrounding the advance and loan guarantees. 1. The Shawmut Advance and Merchants National Loan. We find that petitioner's advance to Associates from the proceeds of the 1969 Shawmut loan and his payments as a guarantor of the 1970 Merchants National loan to Associates resulted in bona fide debts which became worthless in 1973. We further find that these debts are deductible as business bad debts. Whether a shareholder's advances to a corporation and a shareholder/guarantor's payment of corporate obligations are to be characterized as bona fide debts or capital contributions is a question of fact which must be determined in the *72 circumstances of each case. See, e.g., Casco Bank & Trust Co. v. United States, supra, 544 F. 2d at 534-535; Gilbert v. Commissioner, 262 F. 2d 512, 514 (2d Cir.), cert. denied 359 U.S. 1002 (1959); Thompson v. Commissioner,73 T.C. 878, 894 (1980). The courts have identified a number of factors which are useful in distinguishing debt from equity, [7] but no single factor is ordinarily decisive of the issue. See John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); cf. Brake & Electric Sales Corp. v. United States,287 F. 2d 426, 428-429 (1st Cir. 1961). However, as this Court has stated: *73 [The] determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973); accord, Gilbert v. Commissioner, 74 T.C. 60, 65 (1980). After reviewing the evidence in light of the relevant factors enumerated by the cases, we find that petitioners' advance to Associates from the Shawmut loan proceeds, and petitioner's payments as a guarantor of the Merchants National loan, created bona fide debts and were not capital contributions. Near the time of the advance and of the guarantee, LaStaiti Associates had been in business for in excess of 30 years, was generating annual gross sales in excess of $ 2 million, and had developed valuable relationships with several department store chains. The 1969 advance and petitioner's guarantee of the Merchants National loan produced funds which were used as working capital for the continuation *74 and required expansion of Associates' existing lines of business. The advance and Merchants National loan were shown on Associates' books as ordinary debts with a definite maturity date, and Associates in fact made substantial repayments of ther loans directly to the lending banks.The enterprise had always been able to repay its loans in the course of its operations, and we find that petitioner reasonably expected that Associates would repay the Shawmut loan and the Merchants National loan without loass to him. Although Associates suffered an operating loss in 1969, it did return a modest profit in 1970; petitioner reasonably expected a decline in Associates' expansion related needs for working capital, which would have permitted Associates to pay its debts. To be sure, there is evidence that Associates would have benefited from an infusion of additional equity capital, but we do not view this factor as having controlling significance; the evidence as a whole indicates that Associates' capital structure was the result of petitioner's inability to contribute additional funds, rather than a preincorporation design to limit his equity investment in the corporation. In light of all *75 the circumstances, we do not find Associates to have been unreasonably capitalized in light of the type of business in which it engaged. [8]
We emphasize that we do not single out any one of the aforementioned factors as determinative. However, after weighing all the relevant factors it is our judgment that petitioner intended to create bona fide debts by his advance to Associates and the guarantee *76 of the Merchants National loan, and we find that this intention was consistent with the economic realities of the situation. Accordingly, we find that petitioner's advance from the Shawmut loan proceeds and his payments on the Merchants National loan produced bona fide debts, not capital contributions. We further find that petitioner's bona fide debts from Associates became worthless in 1973. Whether a debt has become worthless within a particular year in a question of fact to be determined on the basis of objective factors, not on the taxpayer's subjective judgment as to the worthlessness of the debt. Redman v. Commissioner, 155 F. 2d 319, 320-321 (1st Cir. 1946); Perry v. Commissioner, 22 T.C. 968, 973 (1954). Worthlessness may be established "by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value, although such is not indispensible". Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F. 2d 47, 48-49 (9th Cir. 1972). Under the regulations, [9] bankruptcy is generally treated as an event indicating at least the partial *77 worthlessness of an unsecured debt. Here, we think that the filing of Associates' bankruptcy petition in 1973 indicated that petitioner's claims against Associates were worthless. It is clear on the basis of the stipulated facts that petitioner will never recover anything from Associates. Furthermore, although the matter is not entirely free from doubt, we find that 1973 was the year in which petitioner's claims against Associates became worthless.
As of the time of the filing of its bankruptcy petition, Associates had *78 debts of $925,282.58, including priority claims of $218,632.96. As of this date, Associates had assets with a value no greater than $609,727.29. The assets actually had a much lesser value; $166,654.29 of the debts due on open account were debts from other Allvend subsidiaries which had also filed bankruptcy petitions on the same day as Associates. Associates' largest category of assets was its machinery, fixtures, and tools valued at $ 276,473. Based on Mr. LaStaiti's testimony, which we considered reliable in this respect, we have found that these items had almost no liquidation value because the fixtures used in the beauty enterprise were largely not subject to removal, and we have also found that Associates' inventory could not be sold at full value. In substance, as of the filing of its bankruptcy petition, priority claims against Associates exceeded its available assets, and Mr. LaStaiti was correct in concluding that his claims against Associates become worthless in 1973. It is true that petitioner was still pursuing his claim as late as 1975, and entertained some hopes that Associates might continue to operate and provide minimal payments to its creditors. However, *79 as we stated in Andrew v. Commissioner, 54 T.C. 239, 248-249 (1970), "[a] bare hope that some recovery might be made in the future does not constitute a sound reason for postponing the time for taking a deduction for a worthless debt". Recognizing that each case considering the effect of bankruptcy or receivership proceedings on the value of a claim turns on its particular facts, see Lieberfarb v. Commissioner, 60 T.C. 350, 355 (1973), we find that petitioner's bona fide debt claims against Associates became worthless in 1973. Having determined that petitioner in fact suffered losses with respect to the Shawmut and Merchants National loans in 1973, we must now determine whether petitioner is entitled to treat his losses as business bad debts, fully deductible against ordinary income pursuant to section 166(a)(1), or as nonbusiness bad debts, which are deductible only as short term capital losses pursuant to section 166(d). A debt acquired by an individual taxpayer will be classified as a nonbusiness bad debt unless the taxpayer establishes that he was engaged in a trade or business and that the loss on the debt was proximately related to his *80 trade or business. Section 1.166-5(b), Income Tax Regs.; Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. on other issues 601 F. 2d 734 (5th Cir. 1979). Although a corporation's trade or business cannot be considered the trade or business of its employees or shareholders, see, e.g., Whipple v. Commissioner, 373 U.S. 193, 202-203 (1963), it is settled that being a corporate employee may constitute a trade or business within the meaning of section 166. Putoma Corp. v. Commissioner, supra, 66 T.C. at 673; see Trent v. Commissioner, 291 F. 2d 669, 674-676 (2d Cir. 1961).In order to establish that petitioner's bad debt losses were incurred in the course of his business of being a corporate employee, petitioner must show that his dominant motive for making the advance and loan guarantee was to protect his continued receipt of salary income for his services as a corporate employee, rather than to indirectly acquire a return as an investor in a successful corporate enterprise. See United States v. Generes, 405 U.S. 93, 103-104 (1972); Whipple v. Commissioner, supra, 373 U.S. at 202-203; *81 United States v. Clark, 358 F. 2d 892, 895 (1st Cir.), cert. denied 385 U.S. 817 (1966); Deely v. Commissioner, 73 T.C. 1081, 1093 (1980). Petitioners argue that in making the advance to Associates from the proceeds of the Shawmut loan, Mr. LaStaiti's dominant motive was to protect his employment with Associates and the other beauty corporations. With respect to the guarantee of the Merchants National loan, petitioners suggest that Mr. LaStaiti had two motives, both of which they claim were related to his trade or business. Petitioners contend that the loan guarantee was necessary for the continued operations of the beauty business, and that the guarantee was executed because failure of the beauty enterprise would have damaged Mr. LaStaiti's business reputation and caused the loss of his employment with Southeastern. They also maintain that an additional motive was to minimize potential losses on Mr. LaStaiti's prior guarantees of obligations of the beauty business; petitioners contend that this motive was related to Mr. LaStaiti's trade or business because the prior guaranteed obligations were purportedly incurred in the course of *82 his trade or business. The Government agrees that one of petitioner's motives for the Merchants National loan was to minimize his potential liability on his prior guarantees of Associates' obligations, and it further contends that this motive was petitioer's dominant motive with respect to the Merchants National loan guarantee and the advance to Associates from the Shawmut loan. However, the Government contends that petitioner's potential liability as an obligor or guarantor of loans for Associates must be considered a part of his investment in the corporation, and that his loan and guarantee to protect this investment were not proximately related to his trade or business of being a corporate employee. We find that petitioner's dominant motive for making the loan and guarantee in question was to protect his employment. Accordingly, petitioners are entitled to business bad debt deductions with respect to their 1973 payments on the Shawmut[10] and Merchants National loans. *83 The determination of a taxpayer's dominant motive for making loans or loan guarantees is an issue of fact to be resolved on the record presented by each case. Smith v. Commissioner, 60 T.C. 316, 318 (1973); see Anderson v. United States, 555 F. 2d 236, 237 (9th Cir. 1977); Shinefeld v. Commissioner, 65 T.C. 1092, 1096 (1976). In making this determination, we must consider objective factors, such as the value of the taxpayer's investment in the corporation and the salary he claims to be protecting, [11] as well as the taxpayer's testimony. The absence of substantial income other than salaries is a significant factor supporting petitioner's claim that his dominant motivation for making the loan and guarantee in question was to protect his salaried employment with the beauty corporations or Southeastern. Petitioner was approximately 60 years old at the time of the transactions in issue, and substantially all of his income was derived from his salaries from the *84 beauty corporations or Southeastern. His employment with the beauty corporations and Southeastern was a full-time job, not a casual endeavor. His concern over the loss of his employment was quite reasonable; had the beauty corporations failed, as was likely in the absence of adequate financing, petitioner would obviously have been out of a job with the beauty corporations, and he also would have been unable to continue his employment at Southeastern. Given that petitioner's employment with Southeastern was not based on his expertise as a banker, but rather on his ability to bring in customers because of his reputation as a successful businessman, we find that he would in fact have lost his job with Southeastern had the beauty corporations failed before their sale. Cf. Gould v. Commissioner,64 T.C. 132, 135-136 (1975); Milbank v. Commissioner,51 T.C. 805, 816-817 (1969). Also considering petitioner's age and absence of means of support other than his employment with the beauty corporations or Southeastern, [12] we find that petitioner's dominant motivation for the loan and guarantee in issue was to protect his employment. *85 It is true that in making the advance and guarantee petitioner also protected his capital investment in Associates and the beauty enterprise as a whole. These investments were not without value prior to the sale of the beauty corporations. However, after considering all the relevant facts, we find that although protection of petitioner's investment was to some extent a consideration in his decision with respect to the advance and guarantee in issue, his dominant motive nevertheless was to protect his employment. Hence, his losses on the advance from the Shawmut loan and on his guarantee of the Merchants National loan are deductible as business bad debts in 1973.
2.The Durfee Trust Loan. In May of 1971, Dartmouth Discourt and Murdock and Sandra MacDonald, petitioners' son-in-law and daughter, borrowed $ 75,000 from Durfee Trust Co. for the use of Associates. Petitioner contends that he signed a guarantee of this loan and also agreed to protect the MacDonalds from any losses with respect to the loan. We find that petitioner was not a guarantor of the Durfee Trust loan. Petitioner asked his son-in-law, manager of Dartmouth Discount, and his daughter to obtain the loan *86 for Dartmouth Discount because, as shown by the evidence, he wanted to leave open the possibility that he could thereafter borrow funds from the same bank on his own credit. This purpose would have been defeated if petitioner had given Durfee Trust a guarantee of the loan, and we accordingly do not credit his testimony that he executed a guarantee of the loan.To be sure, we believe petitioner's testimony that he gave oral assurances to the MacDonalds that he would protect them from loss on the loan. But the situation strongly suggests merely a father's informal assurance to his daughter and son-in-law that he would reimburse them by the way of gift for any loss that they might sustain. In the circumstances, we find that petitioner's purported agreement to indemnify the MacDonalds for any losses on the Durfee Trust loan was not intended to create a valid debtor-creditor relationship. See Ellisberg v. Commissioner,9 T.C. 436, 466-467 (1947); cf. Estate of Kamborian v. Commissioner,469 F. 2d 219, 222 (1st Cir. 1972), affg. 56 T.C. 847 (1971). Accordingly, petitioner's payments on account of the Durfee Trust loan were voluntary, and *87 he is not entitled to any bad debt deduction for such payments. Section 1.166-1(c), Income Tax Regs.
3. The Franklin National and Domestic Credit Loans. We find that petitioner's 1973 payments with respect to the Domestic Credit and Franklin National loans were contributions to the capital of Allvend. Petitioner's expections of repayment as to prior loans and guarantees were premised on the assumptions that the sale of the business would provide Associates with needed working capital and that there would be an easing of demands for expansion of the business with a commensurate decrease in Associates' needs for working capital. However, by the time of petitioner's guarantees of the Domestic Credit and Franklin National loans, it should have been evident to petitioner that these assumptions were unreasonable and that further guarantees fully subjected his assets to the risk of the business to the extent of the guarantees. If petitioner had no reasonable expectation that the business would succeed at the time the guarantees were made, then the guarantees do not result in the creation of bona fide debts. See Plantation Patterns, Inc. v. Commissioner,462 F. 2d 712, 723 *88 (5th Cir.), cert. denied 409 U.S. 1076 (1972).
In 1971, the beauty corporations as a whole incurred a net loss of $ 89,105.99. Total assets exceeded liabilities by only $ 110,865.61 as of December 31, 1971, and there was a retained earnings deficit of $ 156,425.04 Allvend began operating the beauty enterprise in February of 1972. However, by June 5, 1972, the date of the modified agreement for the transfer of petitioner's stock in Associates, Roan San, and V.V.N. to Males Only, it was evident that Associates and the beauty enterprise were still suffering from drains on their working capital, and that Allvend was unable or unwilling to provide additional capital. The modified agreement indicates that Associates required immediate financing of $ 175,000, and that petitioner was required to obtain this financing as an "essential prerequisite" to the plan of acquisition. Furthermore, the agreement contemplated that Associates would need between $ 100,000 and $ 500,000 of additional working capital, and that petitioner would also attempt to arrange for the provision of this additional capital in exchange for additional shares of Allvend stock. Also, as further evidence *89 of Allvend's lack of access to additional working capital needed by Associates, we note that petitioner sought to have Allvend's president replace petitioner as a guarantor of Associates' loans and leases, but the banks and lessors did not find the additional guarantee sufficient to warrant releasing petitioner from his obligations. In the circumstances, we find that at the time of petitioner's guarantee of the Domestic Credit loan in July of 1972, and at the time of petitioner's guarantee of the Franklin National loan in 1973, he had no reasonable expectation that Associates would be able to pay off the loans. See Casco Bank & Trust Co. v. Commissioner,supra, 544 F. 2d at 533-535; Plantation Patterns, Inc. v. Commissioner, supra,462 F. 2d at 722-723; C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 656-569 (1968), vacated and remanded per stipulation 406 F. 2d 290 (6th Cir. 1969); and Funk v. Commissioner,35 T.C. 42, 50 (1960). Accordingly, his payments with respect to these guarantees were contributions to Allvend's capital and are not deductible as bad debts under section 166(a), *90 I.R.C. 1954. [13]
To summarize, we hold (1) that petitioners are entitled to business bad debt deductions for their 1973 payments on the Shawmut and Merchants National loans, (2) that petitioner is entitled to no deduction with respect to his payment of the Durfee Trust loan, and (3) that petitioner's 1973 payments with respect to the Domestic Credit and Franklin National loans were contributions to the capital of Allvend and are thus not deductible as bad debts. Decision will be entered under Rule 155. Footnotes
1. In the calendar years 1967-1973, petitioner received the following income from the beauty corporations: ↩
Year
Associates
La Baron
V.V.N.
Total
1967
$ 14,700
$ 9,100
$ 2,000
$ 25,800
1968
15,750
9,450
5,400
30,600
1969
15,600
5,400
5,200
26,200
1970
300
6,550
5,200
12,050
1971
0
0
0
0
1972
875
125
0
1,000
1973
0
0
0
0
2. The record contains audited consolidated financial statements for Associates and its "subsidiary companies" for the year ended December 31, 1970. However, it is unclear whether La Baron is included in these statements, since the stipulation indicates that Associates acquired La Baron in "the early 1970's". Ron San and V.V.N. are not included in the audited financial statements for 1970. ↩
3. LaSTAITI ASSOCIATES, INC. and SUBSIDIARY COMPANIES CONSOLIDATED BALANCE SHEET AS OF DECEMBER 31, 1970 ↩
ASSETS
Current assets: Cash
$ 1,163.20
Accounts receivable,
trade
53,096.78
Loans & accounts
receivable: Affiliates (net)
$ 159,789.37
Other
9,322.86
169,112.23
Merchandise inventory
214,698.80
Prepaid items
77,226.94
$ 515,297.95
Investments, at cost
7,350.00
Fixed assets, net of
accumulated
depreciation: Furniture & fixtures
$ 290,172.69
Automobiles
3,706.80
Leasehold improvements
1,785.98
295,665.47
Other assets: Cash surrender value-life
insurance
9,505.50
Goodwill
22,184.29
Deposits
1,730.00
33,419.79
Total Assets
$ 851,733.21
LIABILITIES & CAPITAL
Current liabilities: Accounts payable, trade
$173,568.85
Notes payable, banks
117,566.25
Current portion of
long-term debt
76,615.48
Notes payable - other
48,286.89
Other current liabilities
53,950.71
$ 469,988.18
Long-term debt
327,974.38
Capital: Capital stock
30,000.00
Additional paid-in
capital
32,159.32
Retained earnings
(8,388.67)
53,770.65
Total Liabilities and
Capital
$ 851,733.21
4. BALANCE SHEET COMBINING THE ACCOUNTS OF LaSTAITI ASSOCIATES, INC., RON SAN REALTY CORP. and V.V.N., INC. DECEMBER 31, 1971 ↩
ASSETS
Current assets
Cash
$ 24,753.80
Accounts & notes receivable
98,744.74
Inventories, at lower of
cost or market
169,514.26
Deposits & prepaid expenses
77,311.50
$ 370,324.30
Fixed assets
Real estate (at appraised
value) net of accumulated
depreciation
$ 247,510.40
Furniture & equipment - stores
& schools, net of accumulated
depreciation
336,479.80
Other fixed assets, net of
depreciation
8,673.43
592,663.63
Other assets - cash value - life
insurance
19,884.29
Total Assets
$ 982,872.22
LIABILITIES AND CAPITAL
Current liabilities
Notes payable - banks
$ 211,275.05
Notes payable - other
26,583.65
Accounts payable - trade
120,372.32
Other accrued expenses
140,647.87
$ 498,878.89
Long term debt
Notes payable - bank
296,437.62
Notes payable - other
76,690.10
373,127.72
Capital
Capital stock
92,459.52
Additional paid in capital
174,831.13
Retained earnings
(156,425.04)
110,865.61
Total Liabilities & Capital
$ 982,872.22
5. The total additional paid-in capital of the beauty enterprise includes $ 142,671.81 which represents the excess of the fair market value of Ron San's real estate over its book value as of December 31, 1971.↩
6. The petitioners have contended on brief that the Government should bear the burden of proof as to its agruments noted above, which were first pleaded in an amended answer filed after the trial. See Rule 142(a), Tax Court Rules of Practice and Procedure. The matter is not nearly as simple as petitioners would have us believe. The deficiency originally determined by the Commissioner was merely the disallowance of a $ 16,735 business bad debt deduction claimed by petitioners on their return. But neither in that return nor thereafter have petitioners ever identified which of the five items now in controversy are related to that claimed $ 16,735 deduction. In their petition they claim business bad debt deductions in the amount of $ 107,698, involving all five items. To the extent that any of the five items were not involved in the original $ 16,735 claimed deduction, it would appear to be strongly arguable that petitioners bore the burden of proof in respect of all↩ elements of the increased deduction, and that the mere fact that the Commissioner singled out any of those elements in his answer or amended answer would not shift the burden of proof to him as to those items. Indeed, our examination of the five items has persuaded us that different results may be reached in respect of different items depending upon different factual considerations which have a bearing on each of the five separate items. However, a full record has been made in this case and we have made our findings on the busis of our consideration of all the evidence without finding it necessary to rely on the allocation of burden of proof between the parties.
7. See, e.g., Slappey Drive Indus. Park v. United States, 561 F. 2d 572, 582 (5th Cir. 1977); In re Uneco, Inc.,532 F. 2d 1204, 1207-1208 (8th Cir. 1976); A.R. Lantz Co. v. United States, 424 F. 2d 1330, 1333 (9th Cir. 1970); Raymond v. United States, 511 F. 2d 185, 190 (6th Cir. 1975); Fin Hay Realty Co. v. United States, 398 F. 2d 694, 696 (3d Cir. 1968); Nassau Lens Co., Inc. v. Commissioner, 308 F. 2d 39, 46-47 (2d Cir. 1962); Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790, 796-799↩ (1975).
8. We note that in arguing that Associates was thinly capitalized and had an excessive proportion of debt in relation to equity capital, the Government has relied solely on figures from Associates' books. However, the books would not necessarily reflect the full value of petitioner's investment in Associates. When petitioner formed the corporation in 1955, he contributed to it the assets of a business which had been operating successfully and expanding for over 20 years. This business undoubtedly possessed substantial goodwill, and it cannot be ignored in computing the value of petitioner's capital investment in the corporation. See Murphy Logging Co. v. United States, 378 F. 2d 222, 224 (9th Cir. 1967); Nye v. Commissioner, 50 T.C. 203, 215↩ (1968).
9. Sec. 1.166-2(c), Income Tax Regs., provides as follows: (c) Bankruptcy. -- (1) General rule. Bankruptcy is generally an indication of the worthlessness of at least part of an unsecured and unpreferred debt. (2) Year of deduction. In bankruptcy cases a debt may become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached. In either case, the mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless, shall not authorize the shifting of the deduction under section 166↩ to such later year.
10. Since the petitioners loaned the proceeds of the Shawmut loan to Associates, rather than guaranteeing a loan to Associates, the measure of their loss in 1973 would be the unpaid balance of the loan, rather than their 1973 payments on the loan. However, it appears that petitioners $ 41,270.23 total payments to the Shawmut bank in 1973 in fact reflect the unpaid balance of the loan.↩
11. See United States v. Generes, supra, 405 U.S. at 106-107; Putoma Corp. v. Commissioner, supra, 66 T.C. at 674↩ and n. 32.
12. Cf. Mann v. Commissioner,34 T.C.M. 377, 381-382, 44 P-H Memo. T.C. par. 75,074 at 376 (1975); Haslam v. Commissioner,33 T.C.M. 482, 484, 43 P-H Memo. T.C. par. 74,097 at 451 (1974); Jaffe v. Commissioner,26 T.C.M. 1063↩, 1069, 36 P-H Memo. T.C. par. 67,215 at 1174 (1967).
13. In light of our findings above, it would appear that petitioner's payments pursuant to his guarantees of the Domestic Credit and Franklin National loans would be added to the basis of his Allvend stock, which he still held at the time of the trial. Petitioners have not contended that Mr. LaStaiti's investment in Allvend became worthless in 1973, the only year before us.↩