JAMES C. AND LILLIAN GARNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garner v. Commissioner
Docket No. 27789-89
United States Tax Court
T.C. Memo 1991-569; 1991 Tax Ct. Memo LEXIS 617; 62 T.C.M. (CCH) 1260; T.C.M. (RIA) 91569; November 25, 1991, Filed *617 Decisions will be entered under Rule 155. P personally guaranteed a loan from a bank to his wholly owned corporation. Three years later, in an effort to meet the corporation's expenses, P also guaranteed another loan to the corporation. The corporation defaulted on both loans. After repaying the loans, P took a business bad debt deduction for both loans. P also took a worthless stock deduction on the corporation's stock for 1984. Held, the loan from the bank to the corporation was a nonbusiness bad debt because P guaranteed the loan to protect his investment. United States v. Generes, 405 U.S. 93, 31 L. Ed. 2d 62, 92 S. Ct. 827 (1972). Held, further, the second loan gave rise to business bad debt because at the time the loan was guaranteed, P was seeking to protect his salary. Held, further, P's stock in the corporation became worthless in 1984, and P is entitled to a worthless stock deduction for that year under sec. 1244, I.R.C.
S. L. Greenberg, for the petitioners. C. Joseph Craven, for the respondent. NIMS, Chief Judge. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' income tax as follows: $ 82,925.53 *618 for the taxable year 1981, $ 336,720.00 for the taxable year 1982, and $ 1,216.00 for the taxable year 1984. After concessions, the issues for decision are (1) whether petitioners incurred a business or nonbusiness bad debt deduction pursuant to section 166; and (2) whether petitioners are entitled to a worthless stock deduction pursuant to section 1244. (All section references are to the Internal Revenue Code as in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioners resided in Woodville, Texas. Petitioners are husband and wife and jointly filed their returns for the years at issue. Petitioner, James C. Garner (Garner) was born on November 1, 1923. Garner was employed by Burton Shipyard, Inc., for approximately 28 years, eventually as its president and treasurer. His employment was terminated effective October 31, 1978, although he continued to receive compensation through November, 1979. On April *619 1, 1980, petitioners acquired all of the capital stock of the H. W. Campbell Construction Company (the corporation) as an initial issue for $ 200,000 cash. The corporation had been incorporated by H. W. Campbell (Campbell) under the laws of Texas in 1978, but it had remained inactive, and no stock had been issued until April 1, 1980. The stock qualified as "section 1244 stock." On April 1, 1980, the corporation, using the $ 200,000 it received for its stock, purchased from Campbell the real and personal property used by Campbell in his construction business. Prior to April 1, 1980, Campbell operated the construction business as a proprietorship. Campbell reported net profits from his construction business in the amounts of $ 374,308.31 for 1977, $ 280,374.86 for 1978, and $ 148,070.00 for 1979. Garner was employed by the corporation on a full-time basis. His responsibilities as an officer and employee of the corporation included reviewing job estimates, making on-site visits and consultations, employee relations, customer development, and general supervision. Garner purchased the corporation after being fired from Burton to keep him busy because he was "more or less a workaholic." *620 He did not need a salary, but he wanted to keep a stream of income nonetheless so that he would not deplete his savings. On April 3, 1980, Garner entered into a continuing guaranty agreement with Allied Merchants Bank (the bank), wherein the bank agreed to extend a line of credit to the corporation, and Garner agreed to personally guarantee the future indebtedness owed by the corporation to the bank. The corporation's fiscal year ran from April 1 to March 31. After an initial loss of $ 154,471 for fiscal year 1981, the corporation reported net income of $ 116,486 for fiscal year 1982 and $ 268,195 for fiscal year 1983. In 1984, however, the corporation experienced severe financial difficulties. Garner, its owner and president, became incapacitated in the latter part of 1983. He had suffered from a hip ailment for many years, and in December of 1983 had surgery to replace his hip and was incapacitated. In his absence, the corporation floundered. The corporation seriously underbid several projects, causing severe losses. It reported a loss for fiscal year 1984 of $ 2,364,178 and a loss of $ 384,483 for fiscal year 1985. By February, 1984, the bank was no longer extending funds *621 to the corporation. On February 3, 1984, the corporation borrowed $ 100,000 from Jerry Wendell (Wendell), a friend of Garner. Wendell agreed to lend the money only if Garner personally guaranteed the loan. The corporation needed the loan to continue operation of the business and to meet the payroll obligations of the corporation. Garner hoped that the loan would provide the breathing room necessary so that he could continue operation of the corporation. The corporation's continued decline showed Garner's hopes to be unjustified. For the corporation's fiscal year ending March 31, 1983, the corporation reflected a positive net worth of $ 364,663 on its Schedule L of Form 1120 (Corporate Income Tax Return). For the fiscal year ending March 31, 1984, the corporation reported a negative net worth of $ 1,940,704. For the fiscal year ending March 31, 1985, the corporation reported a negative net worth of $ 2,330,723. As of March 31, 1984, the corporation had one job in progress, with a contract bid of $ 12,995. On February 2, 1984, the corporation filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The petition was dismissed by agreement on March 5, 1984. On December *622 21, 1984, after the corporation defaulted on the loan that it owed to Wendell, Garner paid to Wendell $ 100,000 pursuant to the guaranty. The loan from Wendell as well as the loans from the bank became worthless in 1984. (The finding as to the year of worthlessness is based on respondent's concession of this fact at trial.) Garner did not receive a salary from the corporation for 1980; however, petitioners reported income from other sources including dividends, interest, rents, and royalties in the amount of $ 151,101 and capital gains for the year of $ 1,192,117. In 1981, Garner received a salary from the corporation of $ 30,000, and petitioners reported income from other sources of $ 135,615. In 1982, Garner received a salary of $ 30,000, and petitioners had other income of $ 417,032 and capital gains of $ 810,133. Garner reported a salary of $ 50,000 for 1983 and $ 40,000 for 1984, while petitioners received income from other sources in the amount of $ 102,153 and $ 19,988 from 1983 and 1984, respectively. Garner did not receive a salary from the corporation in 1985, and petitioners received $ 14,954 in income from other sources. Pursuant to the terms of the continuing *623 guaranty agreement between Garner and the bank, Garner paid the bank $ 297,322.90 in 1984 and $ 800,000.00 in 1985. Garner also made payments of $ 300,000 to the bank in 1983. The $ 300,000 payment in 1983 and the resulting deductions are not at issue in this case. OPINION The first issue for decision is whether Garner's payments on the guarantees of the loans to the corporation from the bank and from Wendell, which became worthless, are deductible as business bad debts or as nonbusiness bad debts. In order for the loss resulting from the worthlessness of a debt to be deductible as a business bad debt, there must be a proximate relationship between the loss and the trade or business of the taxpayer. Sec. 1.166-5(b), Income Tax Regs. In determining whether this relationship is present, the proper measure is that of the taxpayer's dominant motivation at the time the loan was made. United States v. Generes, 405 U.S. 93, 31 L. Ed. 2d 62, 92 S. Ct. 827 (1972); Smith v. Commissioner, 60 T.C. 316, 318 (1973). The burden is on petitioner to establish a dominant business motivation. Smith v. Commissioner, supra at 318. Respondent concedes that the *624 loans made by Garner to the corporation, in the form of the continuing guaranty with bank and a personal guaranty with Wendell, became worthless in 1984. Respondent argues, however, that Garner's dominant motive at the time of the guarantees was not related to any trade or business. Rather, respondent contends that the guarantees were made to protect Garner's investment in the corporation. Petitioners, on the other hand, argue that Garner's dominant motivation was business related; that is, to protect his employment and salary with the corporation. The distinction between a shareholder-employee's motive in protecting his investment and his motive in protecting his employment and salary is blurred at best. Generes and its progeny have established objective criteria to aid courts in their search. Our investigation centers around three factors: the size of the taxpayer's investment, the size of his after-tax salary, and the other sources of gross income available to the taxpayer at the time of the guarantees. United States v. Generes, supra.The larger the taxpayer's investment, the smaller his salary, and the larger his other sources of gross income, *625 the more likely are the courts to find a dominant nonbusiness motive for the guaranty. United States v. Generes, supra; see also Hutchinson v. Commissioner, T.C. Memo 1982-45. In Generes, the taxpayer owned 44 percent of the stock in the corporation to which the loans were made, and his son-in-law also owned 44 percent of the stock. The son-in-law worked full time and was in charge of the daily operations of the business. The taxpayer, who held the title of president of the corporation, worked no more than six to eight hours a week for the corporation. As president, the taxpayer received an annual salary of $ 12,000. His initial investment was $ 38,900, and his gross income independent of his salary as president was $ 40,000. United States v. Generes, supra at 97-98. The Supreme Court held that on the facts in Generes, the taxpayer's dominant motive could not have been to protect his salary and his employment. The Supreme Court examined the relation of his salary to his investment, as well as his significant outside income, and determined that he had not established that his dominant motive was to *626 protect his employment and his salary. United States v. Generes, supra at 106. In the instant case, petitioners initially invested $ 200,000 in the corporation. In 1980, the year that Garner guaranteed the loan from the bank, he took no salary from the corporation, while petitioners' income from other sources exceeded $ 1.3 million. His salary for succeeding years ranged between $ 30,000 and $ 50,000 per year. Petitioners had gross income from sources other than Garner's salary from the corporation of anywhere from $ 15,000 to over $ 1 million. Utilizing the criteria as set forth in Generes, we find that petitioners have failed to establish that Garner's dominant motivation in guaranteeing the loans from the bank was to protect his employment with, and salary from, the corporation. Petitioners argue that the corporation had the potential to generate substantial earnings and that it was these earnings, taken as a salary, that Garner was protecting. It is true that Campbell received income ranging from just under $ 150,000 per year to nearly $ 375,000 per year before selling to Garner. However, evidence of the corporation's potential earnings only *627 goes so far as to support the contention that Garner hoped to receive a return on his investment. Garner could have reinvested the earnings in the corporation, taken them as a dividend with respect to his stock, or taken them in the form of a salary. In fact, in 1983, the corporation reported income of $ 268,195, while Garner only received a salary of $ 50,000. Thus, petitioners have not shown that Garner's salary from the corporation, and not his investment in the corporation, was the dominant interest he was seeking to protect. While it may be true that Garner had a legitimate and even significant interest in protecting his salary as an employee, such a motivation is not enough. United States v. Generes, supra. We cannot believe that Garner guaranteed loans of over $ 1 million to protect his $ 30,000 to $ 50,000 a year salary. Indeed, Garner stated at trial that he did not need a salary, and invested in the corporation to keep busy and to maintain his savings. Thus, his motivation to protect his salary did not predominate. An examination of the objective criteria at the time Garner guaranteed the loan from Wendell to the corporation necessitates *628 a different conclusion. We must look at the taxpayer's motivation when the guaranty was made. See Brooks v. Commissioner, T.C. Memo 1990-259. In February, 1984, when the loan from Wendell was guaranteed petitioners' investment in the corporation was nearly, if not totally worthless. The corporation's financial statements reflected a negative net worth of nearly $ 2 million as of March 31, 1984. Garner received a salary of $ 40,000 from the corporation in 1984, while petitioners' outside income was only $ 19,988. Analyzing this objective evidence, we conclude that Garner's dominant motive in guaranteeing the Wendell loan was to protect his employment and salary with the corporation. Garner's financial situation and that of the corporation changed dramatically in the three years between the loan from the bank and the loan from Wendell. The value of his investment in the corporation was nearly, if not totally, worthless by 1984, reducing the likelihood that he was seeking to protect his investment with the Wendell loan. Petitioners' outside income decreased from more than $ 1.2 million in 1982 to just under $ 20,000 in 1984, leaving Garner's salary from the *629 corporation petitioners' primary means of support. Therefore, we find that Garner was protecting his salary when he made the guaranty as to the loan from Wendell, and petitioners are entitled to a business bad debt deduction for 1984 in the amount of $ 100,000. The next issue is whether petitioners are entitled to a worthless stock deduction pursuant to section 1244. Section 1244(a) provides: (a) GENERAL RULE. -- In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as an ordinary loss.
Generally, a taxpayer may take only a capital loss if the stock owned becomes worthless. Sec. 165(g). Section 1244(b) offers certain taxpayers ordinary loss treatment, but limits the ordinary loss deduction to $ 50,000 per year, or $ 100,000 per year for taxpayers filing jointly. Section 1244(d)(3) states that for purposes of the net operating loss rules of section 172, any amount of loss that is treated as an ordinary loss because of section 1244(a) is to be treated as attributable *630 to the taxpayer's trade or business; therefore, a section 1244 loss can give rise to a net operating loss carryback. Sec. 1.1244(d)(4), Income Tax Regs. Any amount of loss over the dollar limit of section 1244(b) is to be treated as a loss from the sale or exchange of a capital asset. Sec. 1244(a) and (b). Respondent concedes that the corporation's stock qualifies as "section 1244 stock." Respondent contends, however, that the stock did not become worthless in 1984 as petitioners contend. Rather, respondent argues that petitioners have failed to establish that the stock retained any worth as of the end of 1983, or, in the alternative, petitioners have failed to show that the stock became worthless in 1984. Whether and in what year the stock of a corporation becomes worthless is to be determined under section 165(g), which provides: (g) WORTHLESS SECURITIES. -- (1) GENERAL RULE. -- If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.
Worthlessness is a question of fact, *631 to be determined from all of the facts and circumstances of the case. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). "A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss." Sec. 1.165-4(a), Income Tax Regs. The burden is on the taxpayer to establish "identifiable events" from which we may conclude that stock has become worthless. Boehm v. Commissioner, 326 U.S. 287, 90 L. Ed. 78, 66 S. Ct. 120 (1945); Scifo v. Commissioner, 68 T.C. 714, 725 (1977). As stated in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940): From an examination of * * * [the cited cases] it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it *632 will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. * * * The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. * * * There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. * * * [Emphasis added.]
An effective form of establishing worthlessness, "though not necessarily conclusive is the existence of an authoritative balance sheet showing whether assets exceed liabilities so as to leave any equity for the stock." Mahler v. Commissioner, 119 F.2d 869, 872 (2d Cir. 1941); *633 Steadman v. Commissioner, 50 T.C. 369, 377 (1968), affd. 424 F.2d 1 (6th Cir. 1970). In the instant case, on March 31, 1983, the corporation had a positive net worth of $ 364,633. As of March 31, 1984, the corporation had a negative net worth of $ 1,940,704, and it had only one job in progress, with a contract bid of $ 12,995. The loans made to the corporation by the bank and guaranteed by Garner were worthless as of March 31, 1984. As of March 31, 1984, the bank had refused to advance the corporation any more money, and Garner had to borrow money from Wendell to meet his payroll obligation. In February of 1984, the corporation filed a voluntary petition in bankruptcy. In short, the present case is one of the "exceptional cases where the liabilities of a corporation are so greatly in excess of its assets * * * such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders." Morton v. Commissioner, supra at 1279. Indeed, the value of the corporation continued to plummet, and by March 31, 1985, the corporation had a negative net worth of $ 2,330,723. *634 Respondent argues that since the corporation continued to operate past 1984 and it paid down some of the debt owed to Garner, the stock was not worthless in 1984. However, the continuing operation of a corporation does not of itself prove value in the corporation's stock, Steadman v. Commissioner, supra at 378; Rand v. Commissioner, 40 B.T.A. 233 (1939), affd. 116 F.2d 929 (8th Cir. 1941), and the Code does not require petitioners to be "incorrigible optimists" about the corporation's future prospects for profit. United States v. White Dental Co., 274 U.S. 398, 403, 71 L. Ed. 1120, 47 S. Ct. 598 (1927). Respondent also argues that petitioners have not met their burden in showing that the stock had value past 1983. An essential factor in showing a stock's worthlessness for a given year is evidence that the stock had value as of the end of the preceding year. Rand v. Commissioner, supra. Respondent maintains that since Garner paid $ 300,000 to the bank pursuant to the continuing guaranty, petitioners have failed to meet their burden in showing the stock had value as of the end of 1983. We disagree. The *635 evidence shows that as of the last measurement of the corporation's net worth for the year the corporation had a positive net worth of $ 364,663. Even with Garner having to pay off $ 300,000 in loans, the corporation had a positive net worth. Granted, the corporation was not a thriving concern with limitless value on December 31, 1983, and was over $ 1 million in debt by March 31, 1984, but if a corporation has potential value, its stock is not worthless. Morton v. Commissioner, supra.It was in December of 1983 that petitioner became incapacitated and unable to monitor the corporation, thus contributing to its demise. It was in early 1984 that the bank stopped providing funds to the corporation. Finally, it was in 1984 that the corporation's liabilities were first determined to greatly exceed its assets, and a petition in bankruptcy was filed. Thus, petitioners have met their burden of showing that the stock had value at the end of 1983, and that it became worthless in 1984. In summary, we hold that (1) petitioners have failed to establish that the loans made to the corporation in the form of the continuing guaranty, which became worthless, were business *636 related, and they are not entitled to a business bad debt deduction; (2) petitioners have established that the loan made to the corporation by Wendell was business related, and petitioners are entitled to a business bad debt deduction with respect to that loan; and (3) petitioners have established that the stock of the corporation became worthless in 1984, and they are therefore entitled to a worthless stock deduction pursuant to section 1244. To reflect the concessions by the parties and the foregoing, Decision will be entered under Rule 155.