**James C. and Lillian GARNER, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

No. 92–4354.

United States Court of Appeals, Fifth Circuit.

March 23, 1993.

S.L. Greenberg, Robert L. Thomas, III, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, TX, for petitioners-appellants.

Abraham N.M. Shashy, Jr., Chief Counsel, IRS, Thomas J. Clark, Gary R. Allen, Chief, Appellate Sec., Tax Div., Dept. of Justice, Robert L. Baker, Atty., Ann B. Durney, Washington, DC, for respondent-appellee.

Before JOLLY and DeMOSS, Circuit Judges, and SCHWARTZ,[1] District Judge.

DeMOSS, Circuit Judge:

This is an appeal from a decision of the United States Tax Court entered March 3, 1992, determining that there is a deficiency in Garner's income tax for the years 1981 and 1982 in the amounts of $315.00 and $336,720.00, respectively.[2] In its Memorandum of Findings of Fact and Opinion reported at 62 T.C.M. (CCH) 1260, 1991 WL 245205, the Tax Court held that (1) Garner's repayment of a loan from Allied Merchants Bank (Bank) to Garner's corporation, pursuant to a continuing guaranty, constituted a non-business bad debt, (2) Garner's repayment of a loan from Jerry Wendell to Garner's corporation constituted a business bad debt[3], and (3) the stock of Garner's corporation became worthless in 1984, resulting in a worthless stock deduction for that year. Garner now appeals the first holding.

## I. FACTS

Starting in 1950, Garner worked for Burton Shipyard, Inc. (Burton), and by 1978 Garner was President and General Manager of Burton with an annual base salary of $62,500. On October 31, 1978 at 56 years old, Garner was terminated from Burton. For the next year, Garner sought unsuccessfully to obtain other construction or related work. During that time, Garner learned from his accountant that H.W. Campbell (Campbell) was interested in selling his construction business H.W. Campbell Construction Company (the corporation), which Campbell had been operating as a sole proprietorship. On April 1, 1980 pursuant to negotiations with Campbell, Garner acquired all of the corporation's stock for $200,000 cash. The corporation then employed Garner on a full time basis, as President.

On April 3, 1980, Garner executed a continuing guaranty agreement obligating him to pay all future indebtedness of the corporation to the Bank on a line of credit. By the end of its first fiscal year on March 31, 1981, the corporation was indebted to the bank in the amount of $385,000. In addition to executing the guaranty, Garner had loaned $20,400 to the corporation by March 31, 1981 and $588,400 by March 31, 1982.

Garner drew no salary during the corporation's first fiscal year, however, he reported income from other sources on his 1980 tax return in the amount of $1,343,-218.[4] In subsequent years (1981–84), Garner reported salaries from the corporation and income from other sources as follows:

| Year | Salary From Corporation | Income From Other Sources |
|------|------|------|
| 1981 | $30,000 | $ 136,015 |
| 1982 | 30,000 | 1,218,232 |
| 1983 | 50,000 | 102,153 |
| 1984 | 40,000 | 19,988 |

For the fiscal years ending from March 31, 1981 to March 31, 1985, the corporation

1. District Judge of the Eastern District of Louisiana, sitting by designation.

2. Although James C. Garner's wife, Lillian Garner, is a party to this action because she filed joint income tax returns with her husband, all transactions here at issue involved only James C. Garner. For convenience, we will refer to James C. Garner in the singular, as "Garner."

3. On February 3, 1984, Garner's corporation borrowed $100,000 from Jerry Wendell (Wendell), Garner's friend. Garner personally guaranteed this loan, which he was required to honor on December 21, 1984. The Tax Court determined that by 1984, Garner's investment in the corporation was nearly worthless. The Tax Court concluded that Garner's dominant motivation at the time he signed the Wendell guaranty was business related considering also that

Garner received a $40,000 salary in that year and had outside income of only $19,988.

4. Garner's income in 1980 consisted of the following:

| Wage and salary from GDM Barge Co., Inc. | $ 4,940 |
|------|------|
| Interest | 111,637 |
| Dividends | 10,551 |
| Net Capital Gains | 1,192,117 |
| Royalties | 1,199 |
| Rent | 4,174 |
| Consulting with Burton | 18,600 |
| Total | $1,343,218 |

The $1,192,117 capital gain was from the sale of GDM Barge Co., Inc. stock in February of 1980 before Garner signed the guaranty in April 1980.

reported a net income (loss) in the following amounts:

| Year | Net Income (Loss) |
|------|-------------------|
| 1981 | ($ 154,471) |
| 1982 | 116,486 |
| 1983 | 268,195 . |
| 1984 | ( 2,364,178) |
| 1985 | ( 384,483) |

The corporation began to suffer severe financial reversals in late 1983 resulting from several jobs that were seriously underbid. In addition, Garner became ill, which contributed to the corporation's misfortunes. In late 1983, the Bank called upon Garner to pay under the guaranty, and he paid the Bank $297,322 during 1984 and $800,000 during 1985. Garner then claimed business bad debt deductions of $145,000 and $800,000 on his 1984 and 1985 income tax returns, part of which he carried back to offset against his 1981 and 1982 income. Garner claimed refunds of $82,926 and $336,720, respectively, for 1981 and 1982.

After an audit, the Commissioner of Internal Revenue (Commissioner) disallowed Garner's claimed deductions finding that he was entitled only to nonbusiness bad debt deductions of payments on the guaranty. On November 16, 1989, Garner filed his petition with the Tax Court contesting the Commissioner's determination. A trial was held on October 17, 1990 in Houston, Texas. In its opinion dated November 25, 1991, the Tax Court held that Garner's repayment of the corporation's bank loans under the guaranty resulted in nonbusiness bad debts. The Tax Court observed that under *United States v. Generes*,[5] Garner was only entitled to a business bad debt deduction if his dominant motivation in guarantying the bank debt was to protect his salary as an employee of the corporation. If, instead, Garner's dominant motivation was to protect his investment in the corporation, Garner was entitled to only a nonbusiness bad debt deduction. Garner's dominant motivation at the time he signed the guaranty is determinative.

The Tax Court noted that during 1980, the year he signed the guaranty, Garner invested $200,000 in the corporation but received no salary from the corporation during that year. Yet, during the same year Garner received income from other sources in excess of $1.3 million. Moreover, in succeeding years, Garner's salary ranged from $30,000 to $50,000 while his income from other sources ranged from $15,000 to over $1 million. Based on these facts, the Tax Court concluded that Garner failed to establish that his dominant motivation in guaranteeing the corporate bank debt was to protect his salary, therefore, he was not entitled to the business bad debt deduction.

Section 166(a) of the Internal Revenue Code (26 U.S.C.) allows a deduction from income for any debt that becomes "worthless" within the taxable year.[6] For individual taxpayers, the Code makes a distinction between business bad debts and nonbusiness bad debts. Under Code Section 172, a business bad debt may be deducted from ordinary income in the year in which the debt becomes worthless, and any unused portion of the deduction may be carried back as a net operating loss to offset income for earlier years. A nonbusiness bad debt, however, is treated as a short-term capital loss, which is subject to the limitations on deductibility imposed by Code Sections 1211 and 1212. 26 U.S.C. § 166(d)(1).[7] In addition, Code Section 172(d)(4) provides that any excess of nonbusiness deductions over nonbusiness income may not be carried back as a net operating loss deduction.

---

**5.** 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972).

**6.** When a guarantor is unable to recover on the claim against the principle obligor, here the corporation, the guarantor sustains a bad debt loss. *Putnam v. Commissioner*, 352 U.S. 82, 84, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956). In this case, there is no dispute that the corporation's debt to Garner became worthless in the years claimed.

**7.** Generally, short-term capital losses are deductible only to the extent of the taxpayer's capital gains for the year, plus $3,000 of ordinary income. *See*, 26 U.S.C. § 1211(b). Under Section 1212(b), the excess of losses not so deducted may be carried forward from year to year until exhausted.

Thus, Garner's bad debts must be characterized as business bad debts or the carry-back of these losses will not be allowed.

Section 166(d)(2) defines a nonbusiness debt as a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Therefore, the debt will be characterized as business or nonbusiness depending upon the relationship between the debt and the taxpayer's trade or business. The Regulations under § 166 require a "proximate" relationship between the debt and the taxpayer's business. Treas.Regs. § 1.166–5(b)(2) (26 C.F.R.). The most common situation concerning the characterization of a debt arises when a taxpayer makes a loan to a corporation in which he is both a shareholder and an employee. *Generes*, 405 U.S. at 100, 92 S.Ct. at 831. In those situations, a taxpayer may lend money to a corporation partly to protect his investment and partly to protect his salary. In this regard, investing does not constitute a trade or business for purposes of the bad debt deduction. *Whipple v. Commissioner*, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963); *Estate of Mann v. United States*, 731 F.2d 267, 274 (5th Cir. 1984). However, being an employee may be a trade or business for purposes of § 166. In determining whether a loss is proximate to his trade or business as an employee rather than his investment interest as a shareholder, Garner's employee status must be the dominant motive for making the loan. *Putoma Corp. v. Commissioner*, 66 T.C. 652, 673 (1976) *aff'd*, 601 F.2d 734 (5th Cir.1979).

Here, Garner has the burden of proving that his dominant motive in signing the guaranty was to protect his status as an employee, rather than to protect his investment. *Generes*, 405 U.S. at 103, 92 S.Ct. at 833; *Estate of Mann*, 731 F.2d at 273 n. 8; *Miles Production Co. v. Commissioner*, 457 F.2d 1150, 1154 (5th Cir.1972). In deciding this question, the Tax Court, as trier of fact, must give proper emphasis to the *objective* factors such as the value of the taxpayer's investment in the company, the salary he claims to be protecting, as well as the taxpayer's testimony. *Generes*, 405 U.S. at 104, 92 S.Ct. at 833; *Putoma Corp.*, 66 T.C. at 673; *LaStaiti v. Commissioner*, 41 T.C.M. (CCH) 511, 1980 WL 4378 (1980). Our task is to review the Tax Court's decision with the purpose of guarding against errors of law and patently incorrect determinations of fact. *Estate of Mann*, 731 F.2d at 273; *Miles Production Co.*, 457 F.2d at 1155 (evaluation of Tax Court's findings and conclusions under Rule 52(a) clearly erroneous standard).

## II. DOMINANT MOTIVE

### A. Objective Criteria

The Tax Court correctly set forth the analysis for this case:

*Generes* and its progeny have established objective criteria to aid courts in their search [for dominant motive]. Our investigation centers around three factors: the size of the taxpayer's investment, the size of his after-tax salary, and the other sources of gross income available to the taxpayer at the time of the guarantees. *Id.* at 1262.

In *Generes*, the Supreme Court compared Generes' $7,000 (after tax) salary that he earned working 6 to 8 hours a week as president of the company, to his original investment in the company of $38,900, constituting more than five times this salary. In addition, the Court emphasized that Generes had significant income from other sources. Additionally, the Court noted that Generes had loaned more than $300,000 to the company and that Generes owned 44% of the company along with his son and two sons-in-law who were in varying degrees dependent upon the company. *Generes*, 405 U.S. at 106, 92 S.Ct. at 834. The Court, therefore, concluded that Generes' dominant motivation could not logically have been to simply protect his employment as opposed to his investment. In its analysis, the *Generes* court also compared the risk versus the potential reward to both Generes' investment and employment interests,

and concluded that the amount of Generes' salary compared to the amount invested in the company, was too small to justify a business bad debt deduction. Significantly, the *Generes* Court tested Generes' self-serving statements regarding his dominant motivation, against an objective comparison of his salary vis-a-vis his investment in the company. *Id.* at 104, 92 S.Ct. at 833 (trier of fact should compare the risk against the potential reward and give proper emphasis to the objective rather than the subjective); *See also, Adelson v. United States,* 737 F.2d 1569, 1574 (Fed.Cir.1984) (warning against dependence upon "mathematical analysis" but remanding for additional findings regarding the actual numbers involved in the taxpayer's business as compared with his investment interest).

▮ The Tax Court found that Garner's dominant motive in signing the Guaranty was to protect his investment of $200,000 and not his salary, which was zero in 1980 especially when compared with the $1.3 million in income from other sources. Garner maintained throughout the Tax Court proceedings that his dominant motive for signing the Guaranty was to protect and secure executive employment and to replace the salary he lost as a result of being terminated by Burton. The record shows that Garner was a "workaholic." When Garner was terminated from Burton and was unsuccessful for a year at obtaining other employment, the chance to buy Campbell Construction was a welcome opportunity. The fact that Garner suffered from physical health problems, such as rheumatoid arthritis, and his advanced age, explains why he was unsuccessful in finding comparable employment.

Garner cites several cases where the Tax Court has held that both receipt of a salary *and* the protection of that employment, for its own sake, are recognized dominant business motives. *See e.g., Estate of Allen v. Commissioner,* 44 T.C.M. (CCH) 9, 17, 1982 WL 10601 (1982); *LaStaiti v. Commissioner,* 41 T.C.M. (CCH) 511, 519–23, 1980 WL 4378 (1980); and *Young v. Commissioner,* 33 T.C.M. (CCH) 397, 400–403, 1974 WL 2589 (1974).

In *Estate of Allen,* the taxpayer, along with two other shareholders of an insurance company, guaranteed bank loans to the company and claimed business bad debt deductions from their payments on those guarantees when the company failed. The Tax Court described its objective in determining dominant motivation was to ascertain the true nature of the debts and expected benefits therefrom, whether in the form of increased share value or salary. After weighing the evidence, the court found that Allen's dominant motivation for guaranteeing the loans was to protect "his job and future salary." *Id.* at 17. The court discussed that when the guaranty was signed, Allen was 61 years old, and he believed that prospects for new employment were very slim. Significantly, however, the court found that his other income was not enough to support himself and his family, and "[h]is ... salary was the major component of his livelihood." *Id.* The court also noted that his 10 year employment contract entitled him to a salary, which would grow as the company's premium income increased. Moreover, the amount Allen risked in the signing the guaranty was far greater than the value of Allen's investment interest in the company, therefore, Allen could not have justified guaranteeing the loans as a means of enhancing his investment.

*LaStaiti* is another case illustrating this concept. Starting in the late 1950's, LaStaiti owned a chain of beauty salons and related businesses. By the late 1960's in addition to his beauty enterprise, LaStaiti served as president and chief operating officer of a bank in which he was a large shareholder. He worked full-time for the bank and was in charge of business development. When his beauty business began to decline, LaStaiti, fearful that it would fail, sought a buyer for the entire business. LaStaiti was concerned that a failure would damage his reputation and have a residual effect on his ability to attract business for the bank. His reputation aside, loss of the bank position would have been a large financial blow because his income was primarily from his bank salary. After his sale of the beauty enterprise, the business continued to decline and eventually filed

for Chapter 11 bankruptcy. LaStaiti had personally guaranteed several loans for his beauty operation. His claim in bankruptcy was a total of $302,000, but he recovered nothing. The Commissioner denied his business bad debt deduction and in response, LaStaiti argued that his dominant motive in guaranteeing the loans was to protect his employment with the beauty corporations, and also to stem off failure of the beauty enterprise, which would have damaged his business reputation and caused the loss of his position with the bank. The Tax Court agreed and found that LaStaiti's dominant motive for making the loan and guaranty was to protect his employment. The significant factors that the court found were: (1) absence of substantial income other than salaries from both the bank and the beauty corporations; (2) his concern over the loss of his bank position if the beauty corporations failed;[8] and (3) his age of 63 years at the time of the loans. *Id.* at 522.

In *Young,* the taxpayer was president and general manager of a construction company in which he owned a majority of the stock. In 1965, he paid the corporation's indemnity to two bonding companies who supplied bid and performance bonds for the corporation. He also paid a bank guaranty on a corporate loan. The Tax Court started with a *"Generes-like"* comparison of Young's after-tax salary income of $11,000 and his total investment of $22,000. In making the comparison, the court distinguished Young's Subchapter–S corporations from the company in *Generes* and concluded that the salary-investment comparison supported Young's testimony that his dominant motivation was to protect his job and salary. Other factors distinguishing this case from *Generes* and pointing to business bad debt deduction were the fact that Young's principal source of income was his salary and Young, as general manager, was responsible for the day-to-day operation of the company. *Id.* at 402.

But, the court highlighted Young's history of self-employment as supporting his testimony and found that Young's desire to be general manager was business oriented rather than investment related, "... we think that his dominant motivation was his employment with those responsibilities and that status which came from being a general manager. After [the construction companies] failed, the petitioner reentered the construction business as a self-employed individual, and as far as we can tell, is still maintaining that status." *Id.* at 403.

We agree with Garner that the courts in all these cases took into account the fact that the taxpayers wanted to secure their employment other than simply to receive a salary, but the courts also hinged their decisions on other objective factors such as whether the taxpayers' salaries were their primary source of income, and the value of their investments compared to the amounts risked in the various bad debts.[9] Although the Tax Court credited Garner's testimony that he wanted to protect his executive employment, the court found that other factors did not support Garner's claim that his dominant motivation was to protect his employment. We cannot hold that these findings are clearly erroneous even if this Court might have decided the case differently.

**B. Subsequent Events**

The Tax Court, Garner and the Commissioner all agree that the point in time at which Garner's dominant motive must be determined is at the time he signed the guaranty, April 3, 1980. Although the Tax Court recognized this fact, it stated,

> We cannot believe that Garner guaranteed loans of over $1 million to protect his $30,000 to $50,000 a year salary.

*Id.* at 1263.

Garner argues that this finding was critical to the Tax Court's conclusion regarding dominant motive, and that the court erred in focusing on a time period after April 3,

---

**8.** The court found that he would have in fact lost his job with the bank had the beauty corporations failed before their sale. *Id.* at 522.

**9.** This is consistent with the time-honored rule that an activity can constitute a trade or business only if it is engaged in with the dominant

motive of earning a profit. *Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir.1985); *Louisiana Credit Union v. United States,* 693 F.2d 525, 532 (5th Cir.1982); *Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir.1963).

1980, when the loans were made and Garner drew the $30,000 to $50,000 salary. These subsequent events, however, were not the Tax Court's main focus. In addition to making the above statement, the court found that in 1980 Garner did not receive a salary, but reported income from other sources including dividends, interest, rents and royalties in the amount of $151,101 and capital gains of $1,192,117. In its opinion, the Tax Court again compared the initial investment to these 1980 figures and concluded,

> ... petitioners have failed to establish that Garner's dominant motivation ... was to protect his employment with, and salary from, the corporation.

*Id.*

We simply cannot conclude that the Tax Court committed clear error in its determination.

Garner argues that the Tax Court failed to properly consider evidence of the amount of salary he expected to earn from the corporation at the time he signed the guaranty. Garner points out that H.W. Campbell had received income ranging from just under $150,000 to nearly $375,000 in the three years prior to selling the business to Garner. Garner argues that he could have reasonably expected to earn the same and this shows that he signed the guaranty in order to protect these potential earnings. The Tax Court observed, however, that evidence of the corporation's potential earnings shows that Garner hoped to receive a good return on his investment. The court noted that Garner could have chosen to take the salary or reinvest the earnings, and that this was borne out in his receipt of a $50,000 salary in a year when the corporation earned $268,195. The Tax Court also noted that Garner testified that he did not need a salary on which to live. Again, we cannot say that the Tax Court clearly erred in its conclusion that, after balancing the objective evidence, Garner's investment motive predominated.

AFFIRMED.