JOHN C. SMITH AND JEAN P. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 22802-91
United States Tax Court
T.C. Memo 1994-149; 1994 Tax Ct. Memo LEXIS 150; 67 T.C.M. (CCH) 2616; April 11, 1994, Filed *150 Decision will be entered for respondent. For petitioners: James A. Williams, Boyce C. Cabaniss, and James F. Martens. For respondent: Joni D. Larson. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined a deficiency of $ 123,930 in petitioners' 1987 joint Federal income tax. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issue for decision is whether petitioner John C. Smith (petitioner) is entitled to a nonbusiness bad debt deduction as a result of a transaction in which petitioner, among other things, received real property that he purchased at a bankruptcy sale for an inflated price from a bankrupt joint venture in which petitioner or petitioner's controlled corporation was the sole remaining participant. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Austin, Texas, at the time the petition was filed. On April 2, 1981, petitioner and Robert L. Bennett incorporated Smith-Bennett Properties, Inc. (Smith-Bennett), under Texas law for the *151 purpose of investing in and developing real property. On July 6, 1984, Smith-Bennett, Poole Enterprises (a Texas general partnership), and four individuals formed a joint venture by the name of Spicewood Springs Venture (SSV) for the purpose of purchasing and developing an 11.4-acre parcel of undeveloped real property located at 6315 Spicewood Springs Road, Austin, Texas (the Spicewood property). A major stream, Bull Creek, runs through the Spicewood property. On July 11, 1984, SSV purchased the Spicewood property from Austin Financial Corp. (AFC), a corporation owned by Gary Bird (Bird), for a total purchase price of $ 1,117,314. SSV financed the purchase of the Spicewood property as follows: (1) SSV assumed a $ 750,000 promissory note of AFC, which promissory note was owed to the United Bank of Texas, and which note was secured by a first lien on the Spicewood property (the AFC promissory note); and (2) SSV gave Bird a second promissory note in the amount of $ 367,314, secured by a second lien on the Spicewood property (the Bird promissory note). Under the terms of the AFC promissory note, for the first year after issuance of the AFC promissory note, interest alone and no principal *152 was due quarterly at a rate of 1.75 percent. At the end of the first year, principal and interest on the promissory note were due in full. If the AFC promissory note was not fully paid at the end of the first year, interest continued to accrue on the principal balance due at an annual rate of 4 percent over the prime rate. Under the terms of the Bird promissory note, interest only at 12-percent per year was due during the first 3 years after issuance of the note. For the next 3 years, quarterly payments of principal and interest of $ 36,904 were due and payable. As a condition of SSV's assumption of the $ 750,000 AFC promissory note, the United Bank of Texas required each corporate, partnership, and individual participant in the SSV joint venture to make guarantees for the full amount due on the AFC promissory note. In addition, the United Bank of Texas required petitioner, Mr. Bennett, and the individual partners in Poole Enterprises (Mr. David Poole and Mrs. Donna Poole) to make personal guarantees for the full amount due on the AFC promissory note. On August 18, 1985, because of the corporate redemption of all of Robert Bennett's shares of Smith-Bennett stock, petitioner *153 [1] became the owner of 100 percent of the outstanding shares of stock in Smith-Bennett, and petitioner agreed to personally indemnify Mr. Bennett against any liability on the AFC promissory note. By mid-1986, the only remaining active participants in the SSV joint venture were Smith-Bennett and Poole Enterprises, the other individual participants having withdrawn. On July 11, 1986, petitioner and his wife pledged to the United Bank of Texas 33,367 shares of stock in Healthcare International, Inc., with a value of $ 300,000 as further security for payment of the AFC promissory note. *154 Pursuant to an agreement of January 2, 1987, Smith-Bennett agreed to the withdrawal of Poole Enterprises, David Poole, and Donna Poole, from the SSV joint venture, and Smith-Bennett agreed to indemnify them against any further liability arising from the Joint Venture Agreement and against any further liability on the AFC promissory note in exchange for a payment by Mr. and Mrs. Poole to Smith-Bennett of $ 160,000 and a pledge by Mr. and Mrs. Poole to the United Bank of Texas, as further security for payment of the AFC promissory note, of a parcel of land known as the Comanche Pass lot located in Travis County, Texas. The withdrawal of Poole Enterprises left Smith-Bennett as the only remaining participant in SSV and petitioner (the only remaining shareholder in Smith-Bennett) as the only remaining personal guarantor on the AFC promissory note. During the recession years of 1986 and 1987, the value of undeveloped real property in the vicinity of Austin, Texas, decreased sharply. The Spicewood property was particularly affected by this decrease in value because it was widely anticipated by the Austin real estate community that the City of Austin would adopt restrictive land use ordinances *155 applicable to such undeveloped riparian property. In the spring of 1987, petitioner informed the United Bank of Texas of the inability of SSV to make further payments on the AFC promissory note, and of his inability to make payments on the AFC promissory note as the guarantor thereof, and petitioner proposed to the United Bank of Texas that SSV default on the $ 750,000 AFC promissory note and that SSV's debt obligation under the AFC promissory note to the United Bank of Texas might be satisfied by way of a bank foreclosure sale of the Spicewood property. In anticipation of SSV's default on the AFC promissory note and the foreclosure sale to which the United Bank of Texas agreed, petitioner obtained approval for a loan of $ 750,000 from the First City National Bank of Austin (Bank of Austin). Petitioner intended that the proceeds of this loan would be used to pay off the $ 750,000 principal balance due on the AFC promissory note. In early April of 1987, SSV defaulted on the AFC promissory note. On April 14, 1987, counsel for the United Bank of Texas notified petitioner by letter that, because of the default on the AFC promissory note, the Spicewood property would be sold on May *156 5, 1987, at a foreclosure sale. On April 28, 1987, petitioner notified Mr. Bird of the pending foreclosure sale of the Spicewood property and of his intention to bid on the property an amount sufficient to pay off the amount due on the AFC promissory note. Shortly before May 5, 1987, it became apparent that if petitioner's bid was successful and if petitioner thereby obtained the Spicewood property at the foreclosure sale at a price that did not enable the Bird promissory note (which was reflected by a second lien on the property) also to be paid off, the Spicewood property would remain encumbered by the Bird promissory note, and petitioner would be able to obtain neither the $ 750,000 loan from the Bank of Austin nor title insurance on the Spicewood property. The necessity of paying off the Bird promissory note vitiated petitioner's effort to obtain the Spicewood property at a foreclosure sale at a price sufficient to pay off only the $ 750,000 AFC promissory note. Petitioner, therefore, on May 5, 1987, had prepared and filed, on behalf of SSV, a petition under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Western District of Texas (bankruptcy court), *157 and the bank foreclosure sale of the Spicewood property was canceled. On June 4, 1987, a motion was filed in the bankruptcy court on behalf of SSV to sell the Spicewood property at a bankruptcy sale, rather than through the previously proposed bank foreclosure sale. Also on June 4, 1987, the United Bank of Texas was placed under receivership by the Federal Deposit Insurance Corp. (FDIC), and the FDIC thereby became the successor creditor on the AFC promissory note. By order of August 4, 1987, the bankruptcy court approved the sale of the Spicewood property at "an amount equal only to the first lien against the property" (namely, the $ 750,000 in principal and $ 87,316 in accrued interest and costs relating to the AFC promissory note), and petitioner was authorized to bid on and to take title to the Spicewood property if his bid was successful. The Bird promissory note was apparently discharged in bankruptcy. On December 4, 1987, the bankruptcy sale of the Spicewood property was conducted in accordance with the bankruptcy court order of August 4, 1987. Petitioner submitted the only bid on the property in the amount of $ 837,316, and the Spicewood property was sold to petitioner. *158 [2] On the same day, the bankruptcy court filed an order confirming the sale of the Spicewood property to petitioner. Petitioner financed his participation in the above transaction with the $ 750,000 in loan proceeds obtained from the Bank of Austin. With the exception of the $ 367,314 Bird promissory note, the Bank of Austin took as security for this $ 750,000 loan to petitioner essentially the identical security as that which had secured the $ 750,000 AFC promissory note, namely, a first lien on the Spicewood property, a lien on the Comanche Pass lot, and petitioners' stock in Healthcare International, Inc.
With the exception of the payment of accrued interest and costs relating to the AFC promissory note, the net effect of the bankruptcy sale was to pay off *159 the $ 750,000 AFC promissory note and to refinance petitioner's ownership of the Spicewood property with the $ 750,000 loan from the Bank of Austin without the encumbrance of the $ 367,314 Bird promissory note. On March 9, 1988, Derrick V. Jones, an appraiser of R. Robinson & Associates, Inc., issued to petitioner an appraisal of the Spicewood property in which he correctly opined that the fair market value of the property was $ 235,000. On April 15, 1988, petitioners' 1987 joint Federal income tax return was timely filed. On Schedule D thereof, petitioners claimed a short-term capital loss in the amount of $ 637,874 for a nonbusiness bad debt. The amount of the claimed nonbusiness bad debt deduction was calculated on the basis of the total $ 837,316 petitioner agreed to pay for the Spicewood property and for additional related costs of $ 35,558, for a total of $ 872,874, reduced by the $ 235,000 appraised value of the Spicewood property that petitioner received, for a total nonbusiness bad debt deduction claimed by petitioners of $ 637,874. The Federal corporate income tax return of Smith-Bennett for its taxable year ending October 31, 1987, was filed on or about January 1, *160 1988, on which it was represented that such return was the "final" tax return of Smith-Bennett and that the Spicewood property had been sold on November 2, 1986, and that, as of the end of its final taxable year, Smith-Bennett had no assets. On audit of petitioners' 1987 joint Federal income tax return, respondent determined that the claimed $ 637,874 nonbusiness bad debt deduction was not allowable. OPINION Taxpayers do not incur deductible losses upon the purchase of property. See sec. 1001(a). For Federal income tax purposes, a purchase of property is regarded as an open transaction until a subsequent sale of the property occurs and a loss is realized. See San Antonio Savings Association v. Commissioner, 887 F.2d 577, 592 (5th Cir. 1989), affg. T.C. Memo. 1988-204; sec. 1.165-1(b), Income Tax Regs.
Taxpayers, however, are entitled under section 166, to deduct worthless nonbusiness debts as short-term capital losses, and taxpayers who make payments with regard to personal guarantees on debt obligations are subrogated to the positions of the original creditors and sustain bad debt losses to the extent they are unable *161 to recover from the original debtors amounts paid in performance of their guarantees. Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Garner v. Commissioner, 987 F.2d 267, 269 n.6 (5th Cir. 1993), affg. T.C. Memo. 1991-569. Generally, Federal income taxation depends upon the substance, not the form of transactions. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Condor International, Inc. v. Commissioner, 98 T.C. 203, 220 (1992). Although taxpayers generally may not disavow the form of transactions into which they entered, see Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); Estate of Durkin v. Commissioner, 99 T.C. 561, 571 (1992) (Court reviewed), where taxpayers' tax reporting and other actions show an honest and consistent respect for the substance of the transactions, they may, under certain limited circumstances, assert the priority of substance over form. Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), *162 revg. and remanding 31 T.C. 918 (1959). In applying the doctrine of substance over form, courts look to objective economic realities of the transactions rather than to the particular form thereof. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). Petitioners contend that petitioner's purchase of the Spicewood property should be ignored and that the transaction before us should be treated in accordance with its alleged substance (namely, petitioner's payment of $ 872,874 in principal, interest, and costs, relating to his guarantee of the AFC promissory note reduced by the partial repayment or receipt by petitioners of the Spicewood property with a fair market value of $ 235,000). Under this view of the transaction, petitioner contends that he is entitled to the claimed $ 637,874 nonbusiness bad debt deduction for 1987. Respondent primarily argues that the form of the transaction before us was that of a sale and purchase, not a payment with respect to a guarantee, that petitioners may not disavow the form of the transaction, and therefore that petitioners are not entitled to a nonbusiness bad debt deduction under *163 section 166. Further, although respondent does not dispute the accuracy of the $ 235,000 appraisal of the Spicewood property, respondent at trial argues that the purchase price of $ 837,316, as stated in the bankruptcy court order, should now be treated as the correct fair market value of the Spicewood property. [3]
*164 We find and conclude that the substance of the transaction before us, for Federal income tax purposes, is to be regarded as a refinancing of the Spicewood property by petitioner. Before his purchase of the property at the bankruptcy sale, petitioner (as sole remaining participant in SSV and through his ownership of the dormant Smith-Bennett corporation) indirectly owned the Spicewood property, which was encumbered by the $ 750,000 AFC promissory note and by the $ 367,314 Bird promissory note. As a result of his guarantee, petitioner potentially owed $ 750,000 plus interest on the AFC promissory note relating to that interest in the property. In addition to petitioner's guarantee, the $ 750,000 promissory note was secured by the Spicewood property, by the Comanche Pass lot, and by petitioners' stock in Health Care International. After petitioner's purchase of the Spicewood property at the bankruptcy sale, petitioner directly owned the Spicewood property, and petitioner owed $ 750,000 on the Bank of Austin promissory note relating to his ownership interest in the property. Petitioner's ownership interest in the property was encumbered by the $ 750,000 Bank of Austin promissory *165 note, but not by the $ 367,314 Bird promissory note. The $ 750,000 promissory note was secured by the Spicewood property, by the Comanche Pass lot, and by petitioners' stock in Health Care International. As a result of the purported purchase or of the refinancing, petitioner did not incur a true out-of-pocket loss, nor did petitioner realize a bad debt. Petitioner's liability as guarantor on the $ 750,000 Bank of Austin promissory note was substituted for his liability on the $ 750,000 AFC promissory note, and the encumbrance on the property represented by the $ 367,314 Bird promissory note was eliminated. In essence, rather than incurring a bad debt, by eliminating the second lien on the property relating to the Bird promissory note, petitioner significantly enhanced his financial situation vis-a-vis his ownership interest in the Spicewood property. Petitioner himself refers to the $ 750,000 loan from the Bank of Austin as a "refinancing" loan (see petitioners' Proposed Findings of Fact 35). Petitioner argues that by obtaining direct ownership of the Spicewood property by way of the bankruptcy proceeding he not only eliminated the Bird lien on the property, but he also minimized *166 expenses that otherwise would have been incurred had he simply made good on his guarantee. That may be true, but that fact does not alter the nature of the transaction. We find that this case is controlled by the fundamental and longstanding Federal income tax principle enunciated in Higgins v. Smith, 308 U.S. 473 (1940). In Higgins v. Smith, supra, which decision predated the enactment of section 267 (and its predecessor), a claimed loss on the purported sale of securities to a wholly owned corporation was disallowed on the ground that, "There is not enough of substance in such a sale finally to determine a loss." Id. at 476. The factual question to be addressed, as stated by the Supreme Court, was -- whether these sales by the taxpayer to * * * [the controlled corporation] were actual transfers of property "out of * * * [the taxpayer] and into something that existed separate and apart from him" or whether they were to be regarded as simply "a transfer by * * * [the taxpayer's] left hand, being his individual hand, into his right hand, being his corporate hand, so that in truth *167 and fact there was no transfer at all." [Id. at 475.]
and the policy was explained as follows: There is no illusion about the payment of a tax exaction. Each tax, according to a legislative plan, raises funds to carry on government. The purpose here is to tax earnings and profits less expenses and losses. If one or the other factor in any calculation is unreal, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire taxpaying group. [Id. at 476-477; citation omitted.]
We note that Higgins v. Smith, supra, is cited repeatedly in the current cases for the above proposition. See, e.g., Cottage Savings Association v. Commissioner, 499 U.S. 554, 565 (1991); Uri v. Commissioner, 949 F.2d 371, 373-374, n.4 (10th Cir. 1991), affg. T.C. Memo. 1989-58; Estate of Durkin v. Commissioner, 99 T.C. 561, 571 (1992). In the case before us, the transaction giving rise to the claimed bad debt occurred either between petitioner *168 and the bankrupt joint venture in which petitioner was the sole participant, or (if the joint venture is viewed as having been terminated) between petitioner and the dormant Smith-Bennett Corp. in which petitioner was the sole shareholder. In truth and in fact, the transaction or transfer was one between petitioner in his capacity as indirect owner of the property to petitioner as direct owner thereof. The bad debt expense claimed for 1987 with respect to this transaction is unreal. No loss or bad debt can be recognized on this transaction for Federal income tax purposes. The transaction before us, in substance, constitutes a mere refinancing, a switching of banks and mortgages, and no real bad debt expense was incurred by petitioner. The accrued interest expenses and other costs that were reflected and paid by petitioner as part of the transaction are to be regarded as petitioner's costs of refinancing his ownership of the Spicewood property. Alternatively, if the transaction is to be regarded, as respondent contends, as a true purchase of property by petitioner from the bankrupt SSV joint venture or from the dormant Smith-Bennett Corp., the claimed bad debt expense at issue *169 would be disallowed on the ground that petitioner's purchase of the property remains an open transaction, and no loss with regard thereto has yet been realized. Petitioner relies heavily on Andrew v. Commissioner, 54 T.C. 239 (1970), in which a taxpayer made payments directly to third parties in order to honor his obligation under an indemnification agreement. In Andrew, we allowed the taxpayer to deduct the payments to the third parties as a bad debt deduction under section 166(f), as in effect for 1965, the year involved in that case. In Andrew, however, the taxpayer, as a result of the payments in question, did not end up owning the very property to which the indemnification payments related. Andrew v. Commissioner, supra, is distinguishable. Based on our conclusion herein, Decision will be entered for respondent. Footnotes
1. The evidence is not completely clear as to the extent to which petitioner Jean P. Smith received an ownership interest in Smith-Bennett, nor the extent to which she participated in other aspects of the transactions relevant to this case. Our use, therefore, of the singular "petitioner" to refer generally to petitioner John C. Smith is not meant as a finding that petitioner Jean P. Smith was not involved in the relevant transactions.↩
2. Our use, in the Findings of Fact, of the terms "sale" and "purchase" are used for convenience and are not intended as affirmative findings as to the true substance of the transaction at issue, which substance we analyze and determine later in this opinion.↩
3. Respondent's effort at trial to contest the value of the Spicewood property violates the commitment respondent's counsel made prior to trial not to contest that the value of the Spicewood property was $ 235,000. In a pre-trial letter mailed to petitioner's counsel in response to petitioner's question as to whether respondent disputed the value of the Spicewood property as determined by petitioner's appraiser, respondent's counsel stated as follows: During the trial of * * * [this case], respondent does not intend to challenge the appraisal dated March 9, 1988, from R. Robinson and Associates, Inc., which we anticipate will be included in the stipulation of facts. In this regard, we do not intend to present our own expert witness to testify to the value of the property, to present an expert witness to challenge the appraisal, to present any evidence with respect to the value of the property, or to challenge the appraisal in any way.↩
Respondent's effort at trial to disavow this commitment and to challenge the value of the property is rejected. We treat the fair market value of the Spicewood property as $ 235,000.